126 P.3d 1262 (2006)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST
Jeffrey T. HALEY, Attorney at Law.
No. 200,153-0.
Supreme Court of Washington.
Argued May 10, 2005.
Decided January 26, 2006.
*1263 Jeffrey Thornton Haley, Bellevue, for Petitioner/Appellant.
Randy Von Beitel, Washington State Bar Assc, Seattle, for Appellee/Respondent.
En Banc.
OWENS, J.
¶ 1 Attorney Jeffrey T. Haley appeals the recommendation of the Disciplinary Board of the Washington State Bar Association (Board) that he serve two six-month suspensions pursuant to counts 2 and 3 of his disciplinary proceedings. Regarding count 2, the Board determined that Haley was subject to a six-month suspension for knowingly violating RPC 4.2(a), which provides that, "[i]n representing a client, a lawyer shall not communicate . . . with a party . . . represented by another lawyer." The Board concluded as to count 3 that Haley was subject to a six-month suspension for knowingly violating RPC 1.7, which prohibits a lawyer from representing a client if the representation is "directly adverse to another client" or "may be materially limited by . . . the lawyer's own interests." RPC 1.7(a), (b). The Board recommended allowing Haley to serve the two six-month suspensions concurrently. The Washington State Bar Association (WSBA) agrees that two six-month suspensions are appropriate but maintains that the suspensions should run consecutively.
¶ 2 Although we hold that, under RPC 4.2(a), a lawyer acting pro se is prohibited from contacting a party represented by counsel in the matter, we apply our interpretation of RPC 4.2(a) prospectively only and dismiss the violation alleged in count 2. We agree that the presumptive sanction for Haley's knowing violation of RPC 1.7 is a suspension, but we conclude that a departure from the Board's recommendation is warranted, particularly in light of the considerable delay in reporting and prosecuting the misconduct. For Haley's violation of RPC 1.7, we therefore impose a reprimand.

FACTS
¶ 3 Counts 2 and 3 of the WSBA's complaint against Haley arose out of separate sets of events that occurred in 1996-1997 and 1988-1991, respectively. Haley does not challenge any finding of fact as made by the hearing examiner or adopted by the Board. Accordingly, such facts are considered verities on appeal to this court. In re Disciplinary Proceeding Against Brothers, 149 Wash.2d 575, 582, 70 P.3d 940 (2003).[1]
¶ 4 Count 2. In 1994, Haley filed a lawsuit against Carl Highland, the former chief executive officer of a defunct closely held corporation, Coresoft, of which Haley was formerly a shareholder and board member. *1264 Initially, Haley acted pro se in the matter but hired counsel when the case went to trial in November 1995. After the trial ended, Haley's counsel filed notice of withdrawal and Haley reverted to pro se status as to appeal and collection issues. Highland was represented by various attorneys at all times during this matter, and Haley knew that Highland was consistently represented by counsel.
¶ 5 The hearing officer and Board concluded that Haley's improper contact with a represented party arose out of two incidents. First, while Haley was acting pro se after the trial, he sent a letter to Highland and his wife proposing settlement. The letter was dated September 9, 1996, and stated in full as follows:
"I am about to spend approximately $25,000 on costs and attorneys fees for the appeal. If the appeal is successful, the personal earnings of both Ronda Hull and Carl Highland will be subject to garnishment to satisfy my judgment and the judgment now held by Carl Highland will be overruled. Also, the amount I am about the [sic] spend on costs and attorneys fees will be added to the judgment.
"This is the last opportunity to settle the case before I spend the money on the appeal. This settlement offer will not be open after this week and may be withdrawn at any time if it is not promptly accepted. I am offering that all claims and judgments between the parties be releases [sic] with no payments. Please respond directly to me."
Decision Papers (DP) at 38. Highland forwarded the letter to his attorney who, in turn, suggested to Haley that the letter constituted a violation of RPC 4.2(a) and warned him not to have any further contact with Highland. Second, on January 31, 1997, Haley again contacted Highland, this time by telephone. Haley left the following voice message on Highland's phone:
"Carl, this is Jeff Haley . . . .
"I hope your attorneys have told you . . . Jim Bates decided that your judgment against me is collectable only from my separate assets and I have none; they're all community assets. And, therefore, your judgment is uncollectable [sic]. And the chance for appeal of that determination by Jim Bates has run so you can't appeal it. . . so that if the appeal proceeds my position can only improve and yours can only get worse and if you have nothing collectable . . . there's no chance of ever getting anything collectable. It seems to me that we ought to settle this case and if we do so Monday . . . there'll be an opportunity on Monday to do so if you're interested. Give me a call."
DP at 41.
¶ 6 In his "Amended Findings of Fact and Conclusions of Law," the hearing officer stated that Haley's letter and phone message were "clearly prohibit[ed]" by RPC 4.2(a), DP at 46, but he acknowledged that there was some authority supporting Haley's position that attorneys acting pro se are not subject to the prohibition. DP at 46-47. Ultimately, in his "Additional Findings of Fact, Application of Standards, and Recommendation," the hearing officer determined that, "because of the specific language of RPC 4.2 (i.e., `In representing a client . . . .') and because of the apparent absence of authority within the state of Washington on this specific issue, Mr. Haley could have harbored a sincere belief that contacts with a represented opposing party were not prohibited." DP at 63. Consequently, the hearing officer concluded that the violation was "negligent" and that the presumptive sanction was thus a reprimand. Id. (citing ABA, Standards for Imposing Lawyer Sanctions std. 6.33 (1991 & Supp.1992) (ABA Standards)).
¶ 7 Deleting the hearing officer's conclusion that Haley's violation was negligent, the Board substituted its contrary determination that "Haley's mental state was knowledge" and that the presumptive sanction was therefore a suspension. DP at 7 (citing ABA Standards std. 6.32). In doing so, the Board took note that Haley knew Highland was *1265 represented by counsel at all times and stated that a "reasonable reading of RPC 4.2 prohibits a lawyer, while representing him[self] or herself, from contacting a represented party." DP at 7-8. The Board also faulted Haley for not "taking time to determine whether his conduct was an ethical violation." DP at 8.
¶ 8 Count 3. In 1988, Haley and four other individuals formed Coresoft, a Washington corporation in the software development business. The four other shareholder/directors were Nicholas Corff, Donald Padleford, Randolph Cerf, and Bruce Haley. In addition to being a shareholder, board member, and secretary of Coresoft, Haley also served as the principal lawyer for the company.
¶ 9 In raising capital for Coresoft, the corporation obtained a $75,000 line of credit directly from Key Bank, which was personally guaranteed by the Coresoft shareholder/directors. This credit was properly secured with a security agreement and UCC-1 financing statement, see chapter 62A.9A RCW, and, as a result, Key Bank maintained a first priority security interest in Coresoft's assets. Additional capital was obtained in the form of $40,000 loaned to Coresoft by Haley in 1988, the funds for which Haley obtained via personal loan. Haley obtained a promissory note from Coresoft and a signed UCC-1 financing statement as part of the loan transaction. However, there was no separate security agreement securing the note, and the UCC-1 financing statement was not filed until October 1990.[2] Haley's purported security interest had second priority behind Key Bank's interest.
¶ 10 In late 1990, the Coresoft board of directors came to realize that the company's financial viability was hopeless. The board concluded that the best option was to form another corporation that would purchase Coresoft's assets for an amount at least covering the $75,000 from Key Bank and, thereby, discharge all personal liability they had individually incurred by guaranteeing the line of credit. With the agreement or acquiescence of the board, Haley undertook the following course of action: (1) Haley formed a new corporation, known as Star Software, for the purpose of purchasing Coresoft's assets while leaving as many liabilities as possible behind;[3] (2) Haley conducted a foreclosure sale on Coresoft's assets, which he appeared to be in a position to do as a second priority security interest holder; and (3) acting as Star Software's attorney, the only bidder at the sale, Haley purchased Coresoft's assets for an amount that covered both Key Bank's $75,000 and the $26,000 remaining due on Haley's $40,000 loan to Coresoft. Coresoft became defunct on February 1, 1991.
¶ 11 Haley concedes that conflicts of interest arose out of this series of events. Specifically, Haley's duty to Coresoft and its shareholders conflicted with his interests in recovering on his personal loan and in moving Coresoft's assets to his new client, Star Software, at the lowest possible price. The hearing officer found that Haley made certain that Star Software took on only those assets and liabilities beneficial to the new company, including foreclosing on assets not covered by his UCC-1 financing statement. The hearing officer also found Haley's actions harmful or potentially harmful to Coresoft *1266 and its shareholders. While the Coresoft board members agreed to the formation of Star Software and the foreclosure sale, Haley did not obtain an informed written consent from Coresoft before the sale to Star Software.[4] The hearing officer concluded that Haley acted "with knowledge" and that the presumptive sanction for the violation was a suspension. DP at 64-66 (citing ABA Standards std. 4.32).
¶ 12 The Board adopted the hearing officer's analysis of the presumptive sanction, but two members of the Board dissented, contending that Haley's failure to obtain written consent was merely negligent and that a reprimand would be the appropriate presumptive sanction.
¶ 13 Recommended Sanctions for Counts 2 and 3. The hearing officer found three aggravating factors (prior disciplinary offense, multiple offenses, and substantial experience) and two mitigating factors (cooperative attitude and delay in the disciplinary proceedings). See ABA Standards stds. 9.22(a), (d), (i); 9.32(e), (j). The hearing officer recommended that Haley be reprimanded for the count 2 violation and suspended for 60 days for the count 3 violation. Having adopted the hearing officer's aggravating and mitigating factors, the Board recommended a six-month suspension for each count, with the two suspensions to be served concurrently.

ISSUES
¶ 14 1. Does RPC 4.2(a) prohibit a lawyer who is acting pro se from contacting a party who is represented by counsel? If so, should the rule be applied in the present case?
¶ 15 2. What is the appropriate sanction for Haley's violation of RPC 1.7?

ANALYSIS
¶ 16 Standard of Review. When a lawyer discipline decision by the Board is appealed, this court has "plenary authority" on review. In re Disciplinary Proceeding Against Whitt, 149 Wash.2d 707, 716, 72 P.3d 173 (2003). While we "do[ ] not lightly depart from the Board's recommendation," we are "not bound by it." In re Disciplinary Proceeding Against Tasker, 141 Wash.2d 557, 565, 9 P.3d 822 (2000). The court reviews conclusions of law de novo. Whitt, 149 Wash.2d at 716-17, 72 P.3d 173. We have "the inherent power to promulgate rules of discipline, to interpret them, and to enforce them." In re Disciplinary Proceeding Against Stroh, 97 Wash.2d 289, 294, 644 P.2d 1161 (1982) (emphasis added); see also ELC 2.1 (recognizing this court's "inherent power to maintain appropriate standards of professional conduct").
¶ 17 Applicability of RPC 4.2(a) to Lawyer Acting Pro Se. RPC 4.2(a) reads in full as follows:
In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
The rule is virtually identical to model rule 4.2. See ABA, Annotated Model Rules of Professional Conduct (5th ed. 2003) (ABA Annotated Model Rules) rule 4.2. While we have not formally adopted the commentary to the ABA Annotated Model Rules, we have noted that it "may be `instructive in exploring the underlying policy of the rules.'" In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 595, 48 P.3d 311 (2002) (quoting State v. Hunsaker, 74 Wash. App. 38, 46, 873 P.2d 540 (1994)). As the comment to model rule 4.2 explains, the rule aims to protect those represented by counsel "against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship and the uncounselled disclosure of information relating to the representation."[5] *1267 In Carmick, we acknowledged that "[t]he rule's purpose is to prevent situations in which a represented party is taken advantage of by adverse counsel." 146 Wash.2d at 597, 48 P.3d 311 (citing Wright v. Group Health Hosp., 103 Wash.2d 192, 197, 691 P.2d 564 (1984)).
¶ 18 At issue in the present case is whether RPC 4.2(a) applies to lawyers acting pro se  or, more precisely, whether a lawyer who is representing himself or herself is, in the words of RPC 4.2(a), "representing a client." This court has not previously addressed this issue; nor has the WSBA issued an ethics opinion, formal or informal, on the question. Other jurisdictions that have considered the rule's applicability to lawyers acting pro se have generally concluded that the policies underlying the rule are better served by extending the restriction to lawyers acting pro se. See In re Segall, 117 Ill.2d 1, 5-6, 509 N.E.2d 988, 109 Ill.Dec. 149 (1987); Comm. on Legal Ethics v. Simmons, 184 W.Va. 183, 185, 399 S.E.2d 894 (1990); Sandstrom v. Sandstrom, 880 P.2d 103, 108-09 (Wyo.1994); Runsvold v. Idaho State Bar, 129 Idaho 419, 420-21, 925 P.2d 1118 (1996); Vickery v. Comm'n for Lawyer Discipline, 5 S.W.3d 241, 259 (Tex.App.1999); In re Discipline of Schaefer, 117 Nev. 496, 507-08, 25 P.3d 191 (2001).
¶ 19 Haley asks this court to take the contrary view and hold that the plain meaning of the word "client" in RPC 4.2(a) precludes application of the rule to a lawyer acting pro se. The word "client" is variously defined as "[a] person or entity that employs a professional for advice or help in that professional's line of work," BLACK'S LAW DICTIONARY 271 (8th ed.2004), and "a person who engages the professional advice or services of another." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 422 (2002). Thus, for the rule to apply to lawyers acting pro se, such lawyers would, in effect, be employing or engaging themselves for advice, help, or services. This, as Haley contends, suggests that lawyers who are acting pro se are excluded from the scope of the rule because such lawyers have no client.
¶ 20 In the alternative, Haley maintains that, even if RPC 4.2(a) were construed to restrict pro se lawyers from contacting represented parties, we should conclude that the rule as applied to him, a lawyer proceeding pro se, was unconstitutionally vague, violating his constitutional due process rights. Such a resolution finds support in Schaefer, 117 Nev. 496, 25 P.3d 191. There, the Nevada State Supreme Court relied on the principle that "a statute or rule is impermissibly vague if it `either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" Id. at 511, 25 P.3d 191 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).[6] The Schaefer court based its determination that Nevada's Supreme Court Rule 182, a rule identical to RPC 4.2(a), was unconstitutionally vague on "the absence of clear guidance" from the Nevada State Supreme Court and on "the existence of conflicting authority from other jurisdictions." 117 Nev. at 512, 25 P.3d 191; see State Bar of Texas v. Tinning, 875 S.W.2d 403, 408 (Tex.App.1994) *1268 (applying standard that "statute, rule, regulation, or order is fatally vague only when it exposes a potential actor to some risk or detriment without giving fair warning of the nature of the proscribed conduct"); see also In re Ruffalo, 390 U.S. 544, 552, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (holding that, in state disbarment proceeding, "absence of fair notice as to the reach of the grievance procedure" violated attorney's due process rights).
¶ 21 Both factors relied on in Schaefer are present here. First, as noted above, no prior opinion of this court has addressed the application of RPC 4.2(a) to lawyers proceeding pro se. Second, in late 1996 and early 1997 when Haley contacted Highland, authority permitting such contacts counterbalanced the prohibitions then existing from four jurisdictions. See Segall, 117 Ill.2d at 5-6, 109 Ill.Dec. 149, 509 N.E.2d 988 (1987); Simmons, 184 W.Va. at 185, 399 S.E.2d 894 (1990); Sandstrom, 880 P.2d at 108-09 (Wyo. 1994); Runsvold, 129 Idaho at 420-21, 925 P.2d 1118 (1996).[7] The comment to rule 2-100 of the California RPCs, a rule identical to RPC 4.2(a) in all material respects, explicitly permits a lawyer proceeding pro se to contact a represented party:
[T]he rule does not prohibit a [lawyer] who is also a party to a legal matter from directly or indirectly communicating on his or her own behalf with a represented party. Such a member has independent rights as a party which should not be abrogated because of his or her professional status. To prevent any possible abuse in such situations, the counsel for the opposing party may advise that party (1) about the risks and benefits of communications with a lawyer-party, and (2) not to accept or engage in communications with the lawyer-party.
Cal. RPC 2-100 discussion ¶ 2. Likewise, a comment to the restatement specifically provides that "[a] lawyer representing his or her own interests pro se may communicate with an opposing represented nonclient on the same basis as other principals." RESTATEMENT (THIRD) OF THE LAW: THE LAW GOVERNING LAWYERS § 99 cmt. e at 73 (2000).
¶ 22 Alongside these explicit statements permitting the questioned contact, other authorities supported a reasonable inference that our RPC 4.2(a) did not foreclose a pro se lawyer's communication with a represented opposing party. For example, the comparable rule in Oregon, DR 7-104(A)(1), put lawyers acting pro se squarely within the rule's ambit:
"(A) During the course of the lawyer's representation of a client, a lawyer shall not:
(1) Communicate or cause another to communicate . . . with a person the lawyer knows to be represented by a lawyer . . . . This prohibition includes a lawyer representing the lawyer's own interests."[8]
The absence of an explicit prohibition in RPC 4.2(a) could have suggested that Washington's rule was narrower in scope than Oregon's and did not apply to lawyers acting pro se. Additionally, the commentary to model rule 4.2 includes the statement that "[p]arties to a matter may communicate directly with each other." ABA, Annotated Model Rules rule 4.2 cmt. 4, at 417. Unlike the commentary to the restatement and to California's RPC 2-100, this comment does not pointedly refer to a lawyer-party acting pro se; consequently, the breadth of the statement permits an inference that all parties may communicate unreservedly with each other. Finally, the holding in Pinsky v. Statewide Grievance Committee, 216 Conn. 228, 578 A.2d 1075 (1990), appears to call into question the policy concerns supporting the *1269 application of RPC 4.2(a) to lawyers acting pro se. In Pinsky, the Connecticut State Supreme Court concluded that a represented lawyer-party had not violated an identical version of RPC 4.2(a) when he directly contacted his landlord, who was also represented by counsel, during an eviction matter. The Pinsky court took note that "[c]ontact between litigants . . . is specifically authorized by the comments under rule 4.2" and concluded that Pinsky was not "`representing a client'" as stated in the rule. Id. at 236, 578 A.2d 1075. The Pinsky court thus determined that communication between a represented lawyer-party and a represented nonlawyer party did not conflict with a key purpose of RPC 4.2(a)  the protection of a represented nonlawyer party from "possible overreaching by other lawyers who are participating in the matter." ABA, Annotated Model Rules rule 4.2 cmt. 1, at 417. Because the Pinsky decision did not address why contacts from a lawyer acting pro se would pose a greater threat of overreaching than would contacts from a represented lawyer-party,[9]Pinsky provides further equivocal authority on the application of RPC 4.2(a) to lawyers acting pro se.
¶ 23 In sum, consistent with the resolution of the same issue in Schaefer, we hold that a lawyer acting pro se is "representing a client" for purposes of RPC 4.2(a), but given the absence of a prior decision from this court, along with the presence of conflicting or equivocal authority from other jurisdictions and legal commentaries, we find the rule impermissibly vague as to its applicability to pro se attorneys and thus apply our interpretation of the rule prospectively only.[10] We therefore dismiss the violation alleged in count 2. We need not reach Haley's alternative contention that the application of RPC 4.2(a) to his communications with Highland violated his free speech rights.
¶ 24 Sanction Analysis for Violation of RPC 1.7. Our court has determined that the ABA Standards should guide our determination of appropriate sanctions in bar disciplinary cases. In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 745, 790 P.2d 1227 (1990); In re Disciplinary Proceeding Against Halverson, 140 Wash.2d 475, 492, 998 P.2d 833 (2000). Under the ABA Standards, after misconduct is found, the court performs a two-part analysis. Halverson, 140 Wash.2d at 492-93, 998 P.2d 833. First, the court determines the presumptive sanction based on the ethical duty violated, the attorney's mental state, and the extent of actual or potential harm caused by the conduct. Id. Second, the court considers aggravating and mitigating factors, which may alter the presumptive sanction or decrease or lengthen a suspension. Id. at 496, 998 P.2d 833; see ABA Standards stds. 9.22, 9.32. The court will generally adopt the Board's recommended sanction unless the sanction departs significantly from sanctions imposed in other cases or the Board was not unanimous in its decision. See In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 259, 66 P.3d 1057 (2003) (holding that the court would "retain the Noble factors of proportionality and degree of unanimity, but discard the remaining three as redundant due to the existence of similar provisions in the Standards and the ELC"); In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 95-96, 667 P.2d 608 (1983) (identifying five factors to be considered in determining appropriate sanction).
*1270 ¶ 25 The determination of the presumptive sanction is straightforward. Haley concedes that his dual representation of Coresoft and Star Software was prohibited by RPC 1.7(a) and his representation of Coresoft was materially limited under RPC 1.7(b) by his own interest in foreclosing on his security interest and transferring Coresoft's assets to Star Software. Therefore, we look to the presumptive sanctions for conflict of interest violations under RPC 1.7:
Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.
Reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client.
ABA Standards stds. 4.32, 4.33 (emphasis added). As to Haley's mental state, the hearing officer concluded that Haley "could not have reasonably believed that the representation of his own interests as a secured party (if, indeed, he was a secured party) or that his role as lawyer for, officer of, and shareholder of Star Software were not directly adverse to, or materially limited by his responsibilities to Coresoft." DP at 47. Haley offers no argument that he failed to recognize that the conflicts of interest existed, and the conclusion by the Board and hearing officer that Haley knew there was a conflict is well supported by the record. In particular, Haley went to members of Coresoft's board of directors for oral authorization regarding some of his actions. It is also undisputed that Haley's actions created the potential for harm to Coresoft and its shareholder/directors. Consequently, Haley is subject to standard 4.32, which makes suspension the presumptive sanction when a lawyer knows of a conflict and causes potential injury to a client.[11]
¶ 26 Having determined that suspension is the presumptive sanction under the ABA Standards, we next turn to the aggravating and mitigating factors under standards 9.22 and 9.32. The hearing officer determined that three aggravating factors were present: a prior disciplinary offense, multiple offenses, and substantial experience in practice. See ABA Standards stds. 9.22(a), (d), (i). The hearing officer identified as mitigating factors Haley's cooperative attitude and the substantial delay in the proceedings. See id. at stds. 9.32(e), (j).
¶ 27 As an initial matter, we note that the "prior disciplinary offense" aggravating factor is no longer present given our resolution of the RPC 4.2(a) issue. In finding that Haley had a prior disciplinary offense, the hearing examiner relied on an unrelated violation of RPC 4.2(a) for which Haley was censured in 1999. The conduct underlying that violation occurred in March 1996, and the subsequent grievance was filed sometime before May 10, 1996, when it was reported to Haley. See Ex. 27. Conversely, the findings of fact indicate that Highland's grievance against Haley relating to the violation of RPC 1.7 could not have been made to the WSBA earlier than July 1996. See DP at 68 (noting the two grievances leading to this matter were filed in July 1996 and February 1997). We have previously held that an after-the-fact offense operates as a prior offense for aggravating factor purposes as long as the lawyer knew he or she was under investigation for the older offense when committing the more recent offense. Brothers, 149 Wash.2d at 586, 70 P.3d 940. However, that holding has no application in this case because nothing in the record suggests that *1271 Haley was under investigation for the RPC 1.7 violation when the so-called "prior offense" (Haley's March 1996 violation of RPC 4.2) occurred. As a result, we are left to consider only the two remaining mitigating and aggravating factors.
¶ 28 The mitigating factors present in this case, in particular the delay in the disciplinary proceedings, are significant enough to justify altering the presumptive sanction. In Tasker, this court found the delay in prosecution "so substantial" and "so compelling" as to reduce the presumptive sanction from disbarment to a two-year suspension. 141 Wash.2d at 570, 9 P.3d 822. Tasker's violations occurred and began to be investigated by the WSBA in 1993-1994. Id. at 561-62, 9 P.3d 822. However, the WSBA's formal complaint against Tasker was not filed until February 1998. Id. at 562, 9 P.3d 822. In relying on delay as the factor tipping the balance toward suspension, the court recognized that Tasker did not cause the delay, that he was subject to the opprobrium of his legal community in the interim, and that the delay resulted from understaffing and slack prosecution by the WSBA. Id. at 568, 9 P.3d 822. Here, Haley's violation of RPC 1.7 occurred in 1990-1991 but was not reported to the WSBA until July 1996. The formal complaint was not filed until November 21, 2000. Thus, the delay between the grievances and formal complaint in both Tasker and this case spanned approximately four years. We must also take note that the substantial delay between Haley's violations and the grievance have now resulted in a near 15-year delay in resolving this case, which weighs heavily in favor of altering the presumptive sanction.[12]
¶ 29 In contrast to the substantial delay factor, the two remaining aggravating factors are relatively insignificant in this case. First, the "substantial experience in practice" aggravating factor is not marked by an exceedingly long period of prior practice. Haley became a member of the Washington bar in 1979 and began practicing law in 1982. Thus, at the time of the violation of RPC 1.7, Haley had been in practice approximately 8 to 10 years. Second, the "multiple offenses" aggravating factor is largely obviated by our holding that Haley did not violate RPC 4.2(a). Instead, we are left only with the hearing officer's finding that "each count itself reflects multiple events constituting misconduct." DP at 67. While Haley's violation of RPC 1.7(a) and (b) occurred more than once during his representation of Coresoft between 1988 and 1991, we cannot conclude that this fact weighs strongly against altering the presumptive sanction.
¶ 30 After establishing the presumptive sanction and weighing the mitigating and aggravating factors, we consider whether, in light of the two remaining Noble factors of proportionality and Board unanimity, the Board's recommendation should be altered. Kuvara, 149 Wash.2d at 259, 66 P.3d 1057; Noble, 100 Wash.2d at 95-96, 667 P.2d 608. We are not persuaded that a downward departure from the presumptive sanction of suspension would be disproportionate under these circumstances. As to unanimity, the Board was split as to the RPC 1.7 violation, with an 11-member majority recommending suspension and 2 dissenting members recommending reprimand. In considering the unanimity of the Board, we give less deference to the decision of a divided board. Whitt, 149 Wash.2d at 723, 72 P.3d 173. Although the division was not especially marked in this case, the lack of unanimity supports altering the presumptive sanction from suspension to reprimand. In sum, the substantial weight of the mitigating factors over the aggravating factors, along with the considerations required by the two Noble factors, leads us to conclude that reprimand rather than suspension is the appropriate sanction for Haley's violation of RPC 1.7.

CONCLUSION
¶ 31 We hold that RPC 4.2(a) prohibits a lawyer who is representing his own interests *1272 in a matter from contacting another party whom he knows to be represented by counsel. However, because we conclude that RPC 4.2(a) was impermissibly vague as applied to Haley, we apply our interpretation of RPC 4.2(a) prospectively only and thus dismiss count 2 in the complaint. We further conclude that, although the presumptive sanction for Haley's knowing violation of RPC 1.7 is suspension, the mitigating factors, in particular the extensive delay in both reporting and prosecution, demand a more lenient sanction. We therefore depart from the Board's recommendation of a six-month suspension and impose a reprimand for Haley's violation of RPC 1.7.
C.JOHNSON, BRIDGE, CHAMBERS, and J.M. JOHNSON, JJ, concur.
MADSEN, J. (concurring).
¶ 32 I agree with part one of Justice Sanders' concurrence. This court currently has a new set of RPCs pending before it. Because I agree with the majority that the better policy is to include self-represented lawyers within the prohibition of RPC 4.2(a), I would revise that rule in conjunction with the review of the RPCs and avoid the issue of prospectivity.
SANDERS, J. (concurring).
¶ 33 The majority holds that self-represented lawyers are "representing a client" under RPC 4.2(a) and therefore may not contact a represented party. But it refrains from sanctioning Haley, implicitly holding that the scope of RPC 4.2(a) is ambiguous. I concur only in the result, because the majority incorrectly construes RPC 4.2(a). The plain language of RPC 4.2(a) exempts self-represented lawyers. And the rule of lenity requires strict and narrow construction of an ambiguous penal statute. We must apply RPC 4.2(a) prospectively just as we apply it today.

I. THE PLAIN LANGUAGE OF RPC 4.2(A) PERMITS SELF-REPRESENTED LAWYERS TO CONTACT REPRESENTED PARTIES
¶ 34 Court rules like the Code of Professional Responsibility "are subject to the same principles of construction as are statutes." In re McGlothlen, 99 Wash.2d 515, 522, 663 P.2d 1330 (1983). Thus, when interpreting a rule we give "the words their ordinary meaning, reading the language as a whole and seeking to give effect to all of it." Heinemann v. Whitman County Dist. Court, 105 Wash.2d 796, 802, 718 P.2d 789 (1986). If the plain language of the rule is unambiguous, additional interpretation is unnecessary. See Nevers v. Fireside, Inc., 133 Wash.2d 804, 815, 947 P.2d 721 (1997); Rest. Dev., Inc. v. Cananwill, Inc., 150 Wash.2d 674, 682-87, 80 P.3d 598 (2003).
¶ 35 The plain language of RPC 4.2(a) unambiguously exempts self-represented lawyers. "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." RPC 4.2(a) (emphasis added). A "client" is "a person who consults or engages the services of a legal advisor," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 422 (2002), or a "person or entity that employs a professional for advice or help in that professional's line of work." BLACK'S LAW DICTIONARY 271 (8th ed.2004). In other words, a "client" is a third party who engages a lawyer. Because self-represented lawyers have no client, see Somers v. Statewide Grievance Comm., 245 Conn. 277, 287, 715 A.2d 712 (1998), under RPC 4.2(a) they may contact a represented party.
¶ 36 The majority concedes that RPC 4.2(a) applies only when a lawyer is "representing a client" but nonetheless construes it to cover self-represented lawyers. Majority at 1269. Apparently, the majority concludes that self-represented lawyers are "employing or engaging themselves for advice, help, or services." Id. at 1267.
¶ 37 This ingenious bit of legal fiction illustrates the wisdom of avoiding interpretations "conceivable in the metaphysical sense" when the plain language of a statute "is both *1273 necessary and sufficient." Burton v. Lehman, 153 Wash.2d 416, 423, 103 P.3d 1230 (2005). Assuming that a self-represented lawyer represents a "client" certainly produces the majority's preferred outcome. Unfortunately, it does so only at the expense of coherence. Lawyers cannot retain themselves any more than pro se litigants can claim legal malpractice or ineffective assistance of counsel. See, e.g., Faretta v. California, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (holding that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of `effective assistance of counsel'"); State v. DeWeese, 117 Wash.2d 369, 379, 816 P.2d 1 (1991); Gall v. Parker, 231 F.3d 265, 320 (6th Cir. 2000). Undoubtedly, wise lawyers follow their own counsel. But it is a neat trick indeed to advise oneself.
¶ 38 The majority's claim to follow an emerging majority rule is unavailing. Indeed, it cites decisions from six states concluding that self-represented lawyers are their own clients. See In re Segall, 117 Ill.2d 1, 509 N.E.2d 988, 109 Ill.Dec. 149 (1987); Comm. on Legal Ethics v. Simmons, 184 W.Va. 183, 399 S.E.2d 894 (1990); Sandstrom v. Sandstrom, 880 P.2d 103 (Wyo. 1994); Runsvold v. Idaho State Bar, 129 Idaho 419, 925 P.2d 1118 (1996); Vickery v. Comm'n for Lawyer Discipline, 5 S.W.3d 241 (Tex.App.1999); In re Discipline of Schaefer, 117 Nev. 496, 25 P.3d 191 (2001). But none offers any more convincing a rationale for this curious conclusion than the majority. Conclusory statements cannot substitute for legal reasoning, and another court's error cannot justify our own.
¶ 39 Likewise, the majority's reliance on the "purpose" of RPC 4.2(a) is misplaced. As the author of the court rules, we are "in a position to reveal the actual meaning which was sought to be conveyed." Heinemann, 105 Wash.2d at 802, 718 P.2d 789. But in the interest of certainty and consistency, we approach them "as though they had been drafted by the Legislature." Id. Whatever the purpose of RPC 4.2(a), it cannot extend to persons and actions its plain language excludes. We may not expand the scope of a rule by fiat. If we conclude that self-represented lawyers should not contact represented parties, we should simply rewrite the rule to clearly prohibit that conduct. Other states have already done so. Compare Cal. R. Prof. Cond. 2-100 discussion § 2 (explicitly permitting self-represented lawyers to contact represented parties) with In re Smith, 318 Or. 47, 53 n. 5, 861 P.2d 1013 (1993) (noting that DR 7-102, Oregon's equivalent to RPC 4.2, "was amended effective January 1991, to add the phrase, `or in representing the lawyer's own interests"'). Lawyers should not have to read slip opinions to divine their professional obligations.

II. THE RULE OF LENITY REQUIRES A CONSTRUCTION OF RPC 4.2(A) EXEMPTING SELF-REPRESENTED LAWYERS
¶ 40 Even assuming that the plain language of RPC 4.2(a) is somehow ambiguous, the rule of lenity requires a strict and narrow construction exempting self-represented lawyers. The rule of lenity is a venerable canon of statutory interpretation, requiring courts "to interpret ambiguous criminal statutes in the defendant's favor." In re Pers. Restraint of Stenson, 153 Wash.2d 137, 149 n. 7, 102 P.3d 151 (2004). See also United States v. Enmons, 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) ("[T]his being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."); Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (holding "ambiguity should be resolved in favor of lenity"). While the Rules of Professional Conduct are only "quasi-criminal," In re Discipline of Little, 40 Wash.2d 421, 430, 244 P.2d 255 (1952), the rule of lenity applies to both criminal and quasi-criminal statutes. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The deciding factor is the nature of the sanction imposed.
¶ 41 As a general rule, courts apply the rule of lenity to any statute imposing penal *1274 sanctions. See, e.g., Kahler v. Kernes, 42 Wash.App. 303, 308, 711 P.2d 1043 (1985) (applying rule of lenity to civil statute imposing penal sanction). "We are mindful of the maxim that penal statutes should be strictly construed." United States v. Cook, 384 U.S. 257, 262, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966). And see Roberta S. Karmel, Creating Law at the Securities and Exchange Commission: The Lawyer as Prosecutor, 61 Law & Contemp. Probs. 33, 34 n. 6 (1998) (noting that courts "have sometimes used the doctrine of lenity to interpret a statute narrowly in a civil case because the statute also has criminal sanctions"). A statute is penal if it "can be punished by imprisonment and/or a fine" and remedial if it "provides for the remission of penalties and affords a remedy for the enforcement of rights and the redress of injuries." State v. Eilts, 94 Wash.2d 489, 494 n. 3, 617 P.2d 993 (1980).
¶ 42 The Rules of Professional Conduct are penal because they concern punishing an offender, not compensating a victim. Professional discipline "is punitive, unavoidably so, despite the fact that it is not designed for that purpose." Little, 40 Wash.2d at 430, 244 P.2d 255. See also In re Ruffalo, 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (noting that disbarment "is a punishment or penalty imposed on the lawyer"); In re Fordham, 423 Mass. 481, 668 N.E.2d 816, 824 (1996) (stating that disciplinary sanctions constitute a punishment or penalty); Stegall v. Mississippi State Bar, 618 So.2d 1291, 1294 (Miss.1993); In re Disciplinary Proceeding Against Rentel, 107 Wash.2d 276, 282, 729 P.2d 615 (1986); Gay v. Virginia State Bar, 239 Va. 401, 389 S.E.2d 470, 474 (1990) (referring to lawyer sanctions as "punishments"); Comm. on Legal Ethics v. Hobbs, 190 W.Va. 606, 439 S.E.2d 629, 634 (1993) (considering what steps would "appropriately punish" the attorney); and People v. Senn, 824 P.2d 822, 825 (Colo.1992) (holding that "disciplinary proceedings supplement the work of the criminal courts to maintain respect for the rule of law and protect the public"). See also Nguyen v. Dep't of Health, 144 Wash.2d 516, 525, 29 P.3d 689 (2001) (characterizing medical discipline as "quasi-criminal" and penal); Kentucky v. Lundergan, 847 S.W.2d 729, 731 (Ky.1993) (finding Kentucky's Legislative Ethics Act a "penal statute" to which "the `rule of lenity' is applicable"); Julie Rose O'Sullivan, Professional Discipline for Law Firms? A Response to Professor Schneyer's Proposal, 16 Geo. J. Legal Ethics 1, 14 (2002) (noting that "disciplinary proceedings seek many of the aims of criminal law and employ similarly punitive and stigmatizing penalties"). While the "purpose of disciplining an attorney is not primarily to punish the wrongdoer," In re Disciplinary Proceeding Against Selden, 107 Wash.2d 246, 253, 728 P.2d 1036 (1986) (emphasis added), punishment is an important purpose  and a necessary consequence  of professional discipline.
¶ 43 Courts have long recognized that disbarment is "penal in its nature" and subject to the rule of lenity. Moutray v. People, 162 Ill. 194, 198, 44 N.E. 496 (1896) (holding statutes authorizing disbarment must be "strictly construed, and not extended by implication to things not expressly within their terms"). See also Ruffalo, 390 U.S. at 550-51, 88 S.Ct. 1222 ("Disbarment . . . is a punishment or penalty imposed on the lawyer" involving "adversary proceedings of a quasi-criminal nature."); (Charlton v. Fed. Trade Comm'n, 177 U.S.App. D.C. 418, 543 F.2d 903, 906 (1976)); In re McBride, 602 A.2d 626, 640-41 (D.C.1992) (applying rule of lenity to statute governing disbarment). The same holds for all other sanctions. "Because attorney suspension is a quasi-criminal punishment in character, any disciplinary rules used to impose this sanction on attorneys must be strictly construed resolving ambiguities in favor of the person charged." United States v. Brown, 72 F.3d 25, 29 (5th Cir.1995); In re Thalheim, 853 F.2d 383, 388 (5th Cir.1988).
¶ 44 In his dissent, Chief Justice Alexander suggests that the Rules of Professional Conduct can tolerate a degree of vagueness. Dissent at 1277-78. But RPC 4.2(a) is not vague. It is ambiguous. And the Rules of Professional Conduct certainly cannot tolerate ambiguity.
*1275 ¶ 45 A statute is ambiguous if it "refers to P, P can alternatively encompass either a or b, and it is beyond dispute that the defendant did a" and vague if it "refers to X, but we cannot tell whether the disputed event is an X." Lawrence M. Solan, Law, Language, and Lenity, 40 Wm. and Mary L.Rev. 57, 62, 78 (1998). No one disputes what Haley did: While representing himself, he contacted a represented party. The only question is whether the term "representing a client" encompasses self-represented lawyers, as well as lawyers representing third parties. And if the term "representing a client" is "susceptible to more than one reasonable meaning," it is ambiguous. City of Seattle v. Guay, 150 Wash.2d 288, 300, 76 P.3d 231 (2003).
¶ 46 Courts routinely apply the rule of lenity to ambiguous statutes. See, e.g., United States v. Granderson, 511 U.S. 39, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (applying lenity because statutory term ambiguous). And see generally Lawrence M. Solan, supra, 40 Wm. and Mary L.Rev. at 117-20. And the rule of lenity is peculiarly appropriate to the Rules of Professional Conduct. We have recognized that "in a disciplinary proceeding, all doubts should be resolved in favor of the attorney." In re Disciplinary Proceeding Against Krogh, 85 Wash.2d 462, 483, 536 P.2d 578 (1975). See also In re Discipline of Little, 40 Wash.2d 421, 430, 244 P.2d 255 (1952). Because lawyers "are subject to professional discipline only for acts that are described as prohibited in an applicable lawyer code, statute, or rule of court," courts "should be circumspect in avoiding overbroad readings or resorting to standards other than those fairly encompassed within an applicable lawyer code." RESTATEMENT (THIRD) OF THE LAW: THE LAW GOVERNING LAWYERS § 5 cmts. b, c at 49, 50 (2000). See also Bruce A. Green, The Criminal Regulation of Lawyers, 67 Fordham L.Rev. 327, 387 (1998) (suggesting "courts should be more accommodating of professional norms than the Restatement contemplates" when interpreting ambiguous rules of professional conduct). Application of the rule of lenity reflects that caution. It demands that we adopt the stricter, narrower construction, excluding self-represented lawyers.

III. CONCLUSION
¶ 47 The majority objects to the plain language of RPC 4.2(a) only because it believes that permitting self-represented lawyers to contact represented parties would violate the "purpose" of the rule. But the putative "spirit and intent" of a rule can trump only a "strained and unlikely" interpretation. State v. Wittenbarger, 124 Wash.2d 467, 485, 880 P.2d 517 (1994). And the plain language of RPC 4.2(a) is neither strained nor unlikely. It prohibits a lawyer representing a client  but not a self-represented lawyer  from contacting a represented party. As the majority concedes, several commentators and courts have found the plain language of essentially identical rules entirely unambiguous. Majority at 1267-69. See, e.g., Pinsky v. Statewide Grievance Comm., 216 Conn. 228, 236, 578 A.2d 1075 (1990); Cal. R. Prof. Cond. 2-100 discussion § 2; and RESTATEMENT (THIRD) OF THE LAW: THE LAW GOVERNING LAWYERS § 99 cmt. e at 73 (2000). We must not manufacture ambiguity and rely on legal fictions to arrive at a preferred result. Especially when we may simply write that result into law.
¶ 48 I therefore concur in result.
ALEXANDER, C.J. (dissenting).
¶ 49 I agree with the majority that RPC 4.2(a) prohibits lawyers who are representing themselves from communicating directly with opposing, represented parties unless they first obtain the consent of the parties' counsel. I disagree, however, with the majority's decision to limit application of this important rule to future violators. I know of no authority that supports imposition of a rule of professional conduct prospectively only. I believe, therefore, that this court should suspend Jeffrey Haley from the practice of law for his violation of RPC 4.2(a). The violation *1276 is especially egregious in light of Haley's claim that he "studied the rule" before directly contacting his opposing party,[1] and in view of the fact that he contacted the party a second time after the party's lawyer warned him that doing so would violate RPC 4.2(a). Because the majority concludes that Haley should not be subjected to discipline for a violation of RPC 4.2(a), I dissent.
¶ 50 The majority correctly observes that among states considering the question with which we are here presented, the prevailing trend has been to apply RPC 4.2(a) to attorneys acting pro se, as was Haley, and not just to attorneys representing someone other than themselves. The majority acknowledges, additionally, that in late 1996 and early 1997, when Haley twice attempted to negotiate a settlement without going through the opposing party's lawyer, at least four jurisdictions already had concluded that RPC 4.2(a) prohibited such contacts. Yet none of the four jurisdictions mentioned by the majority applied the rule to pro se attorneys on a prospective basis only, as the majority does here. Rather, all four jurisdictions applied the rule to the facts before them, as this court should do. See Runsvold v. Idaho State Bar, 129 Idaho 419, 421, 925 P.2d 1118 (1996) (attorney reprimanded because Idaho's version of RPC 4.2(a) "applies to prevent the pro se attorney from directly contacting a represented opposing party"); In re Segall, 117 Ill.2d 1, 6, 109 Ill.Dec. 149, 509 N.E.2d 988 (1987) ("A party, having employed counsel to act as an intermediary between himself and opposing counsel, does not lose the protection of the rule merely because opposing counsel is also a party to the litigation. Consequently, an attorney who is himself a litigant may be disciplined . . . when, as in the case at bar, he directly contacts an opposing party without permission from that party's counsel."); Comm. on Legal Ethics v. Simmons, 184 W.Va. 183, 185, 399 S.E.2d 894 (1990) (attorney suspended for six months); Sandstrom v. Sandstrom, 880 P.2d 103, 109 (Wyo.1994) (district court did not err in applying RPC 4.2 to prohibit an attorney from contacting his wife during their divorce). These four opinions, all cited by the majority, are sound and make it clear that at the time Haley engaged in the prohibited conduct, the weight of authority supported the disciplining of violators and did not even hint at the prospective-only application embraced by the majority in this case. In shielding Haley from application of RPC 4.2(a), the majority borrows from the reasoning of the Nevada Supreme Court in In re Discipline of Schaefer, 117 Nev. 496, 25 P.3d 191 (2001). There, the Nevada court declined to punish an attorney's violation of the Nevada equivalent of RPC 4.2(a) because of: (a) the "absence of clear guidance" from the court, and (b) "conflicting authority from other jurisdictions" as to whether the rule applied to pro se attorneys. Schaefer, 117 Nev. at 512, 501, 25 P.3d 191. In effect, the majority establishes a new test: if there is any doubt about how a rule will be construed, a violator will not be punished. That is a dangerous message to send.
¶ 51 Furthermore, whereas the Schaefer court relied on due process principles articulated by the United States Supreme Court in Connally[2] in applying the Nevada rule prospectively, it is worth noting that this court has never drawn from Connally the proposition that discipline is inappropriate just because a rule is being interpreted for the first time. In fact, in Haley v. Medical Disciplinary Board, 117 Wash.2d 720, 818 P.2d 1062 (1991), the only discipline case in which this court cited Connally, we affirmed sanctions against a physician for violating a statute *1277 prohibiting "`moral turpitude'" although we recognized "uncertainties associated with" the statutory language in question. Haley, 117 Wash.2d at 740, 818 P.2d 1062. Thus, this court has previously declined to interpret Connally in the way the Nevada court did in Schaefer and the majority does here  as if professional license holders have a due process right to avoid discipline simply because a court is newly construing the rule in question. Such an interpretation will have far-reaching impact, as many discipline cases that come before this court raise an issue of construction. In declining to sanction Haley for violating RPC 4.2(a), despite the fact that Haley had "studied" the rule and should have known that the prevailing construction prohibited his conduct, the majority suggests that questionable conduct will be tolerated as long as there is no prior Washington court decision exactly on point.
¶ 52 We must remember that our purpose in disciplining attorneys is to "`protect the public and to preserve confidence in the legal system.'" In re Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 762, 801 P.2d 962 (1990) (quoting In re Disciplinary Proceeding Against Rentel, 107 Wash.2d 276, 282, 729 P.2d 615 (1986)). In Curran, an attorney argued that he should not be punished for violating RLD 1.1(a) because, in forbidding actions that reflect "disregard for the rule of law," the rule was unconstitutionally vague. Id. at 758, 801 P.2d 962. This court said, "[W]e choose to give these words a narrowing construction. . . . This law is not so vague as to be unconstitutional, given this limiting construction." Id. We noted that "a statute will not be considered unconstitutionally vague just because it is difficult to determine whether certain marginal offenses are within the meaning of the language under attack." Id. at 759, 801 P.2d 962 (citing Jordan v. De George, 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951)). This court suspended the attorney, Curran, saying, "Standards may be used in lawyer disciplinary cases which would be impermissibly vague in other contexts." Id. (citing Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 666, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985)). Just as we disciplined Curran there, despite uncertainty about the rule in question, so should Haley be disciplined for violating RPC 4.2(a) in order to "protect the public and to preserve confidence in the legal system." Curran, 115 Wash.2d at 762, 801 P.2d 962 (emphasis omitted).
¶ 53 Curran also weighs against the position taken by Justice Sanders in his concurring opinion that attorney discipline is a punishment scheme and therefore is subject to the rule of lenity  a criminal law doctrine. We said in that case, "[T]he purposes of bar discipline do not precisely duplicate the purposes of the criminal law." Curran, 115 Wash.2d at 762, 801 P.2d 962 (citing In re Disciplinary Proceeding Against Brown, 97 Wash.2d 273, 275, 644 P.2d 669 (1982)). More notably, we have said numerous times that "[p]unishment is not a proper basis for discipline." Brown, 97 Wash.2d at 275, 644 P.2d 669 (citing In re Disciplinary Proceedings Against Purvis, 51 Wash.2d 206, 223, 316 P.2d 1081 (1957)). In In re Disbarment of Beakley, 6 Wash.2d 410, 424, 107 P.2d 1097 (1940), we said:
Neither disbarment nor suspension is ordered for the purpose of punishment, but wholly for the protection of the public. When a matter such as this comes before the court, the question presented is not: What punishment should be inflicted on this man? The question presented to each of its judges is simply this: Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate in continuing to hold him out to the public as worthy of that confidence which a client is compelled to repose in his attorney?
Thus, this court has long rejected the notion that attorney discipline is penal, and the concurrence cannot point to any discipline case in which we have applied the rule of lenity to resolve ambiguity in the attorney's favor.
¶ 54 In sum, because the purpose of attorney discipline is to protect the public, it is our duty to enforce RPC 4.2(a) in this case. *1278 The majority provides no authority for applying RPC 4.2(a) to pro se attorneys prospectively only. I would apply the rule to Haley and suspend him for six months.
NOTES
[1] The WSBA's motion to strike the appendix attached to Haley's brief is granted pursuant to RAP 10.3(a)(7). but the motion for terms of $500 is denied. Haley's motion to file additional briefing and submit a declaration of authenticity by Nicholas Corrf is denied. Notably, the substance of the materials disputed in these motions is not germane to our resolution of the issues in this case.
[2] Under the U.C.C., as adopted in Washington, a security interest in collateral becomes enforceable when "[t]he debtor has authenticated a security agreement that provides a description of the collateral." RCW 62A.9A-203(b)(3)(A). Perfection of a security interest (i.e., acquiring priority over unperfected security interests and lienholders under RCW 62A.9A-317) generally requires filing a UCC-1 financing statement. RCW 62A.9A-310(a). Given these rules, the absence of a separate security agreement and Haley's failure to file the UCC-1 financing statement until Coresoft was failing may have allowed Coresoft to void his security interest; thus, Coresoft and its shareholders might have been in an economic position that was potentially more favorable than they were aware of.
[3] Of the original Coresoft shareholders, only Haley and his brother Bruce became shareholders in Star Software. The other Coresoft shareholders declined Haley's invitation to invest in the new company.
[4] None of Coresoft's shareholder/directors are complaining parties in this disciplinary matter. The grievance was filed by Highland after Haley initiated the litigation described in count 2.
[5] ABA, Annotated Model Rules rule 4.2 cmt. 1, at 417. The annotation to model rule 4.2 summarizes that "Rule 4.2 preserves the lawyer-client relationship, protects clients against overreaching by other lawyers, and reduces the likelihood that clients will disclose confidential or damaging information." Id. at 418 (citing ABA Formal Ethics Op. 95-396 (1995)).
[6] The dissent recalls that in Haley v. Medical Disciplinary Board, 117 Wash.2d 720, 818 P.2d 1062 (1991), we cited Connally but nevertheless "affirmed sanctions against a physician for violating a statute prohibiting "`moral turpitude'" although we recognized `uncertainties associated with' the statutory language in question." Dissent at 1276-77 (quoting Haley, 117 Wash.2d at 740, 818 P.2d 1062). The dissent fails to acknowledge, however, that more recently in In re Disciplinary Proceeding Against Halverson, 140 Wash.2d 475, 998 P.2d 833 (2000), this court distinguished Haley and declined to find a violation of RLD 1.1 ("Commission of Act of Moral Turpitude") because "a bright-line rule prohibiting attorney-client sexual relations [did] not exist." Id. at 491-92, 998 P.2d 833.
[7] Looking no further than these four cases, the dissent ignores the counterbalancing authority found in rules, commentaries, and case law from other jurisdictions. Dissent at 1276.
[8] In re Conduct of Smith, 318 Or. 47, 49 n. 1, 861 P.2d 1013 (1993) (quoting DR 7-104(A)(1)) (emphasis added). Oregon's RPC 4.2 (adopted effective January 1, 2005) likewise makes explicit that the prohibition applies to lawyers acting pro se: "In representing a client or the lawyer's own interests, a lawyer shall not communicate . . . with a person the lawyer knows to be represented by a lawyer . . . ." (Emphasis added.)
[9] That a lawyer-party seeks representation may at least suggest that he or she does not have "the superior knowledge and skill of the opposing lawyer" in the subject of the litigation, a circumstance that would arguably diminish the risk of overreaching in the represented lawyer-party's contacts with other represented parties. Pinsky, 216 Conn. at 236, 578 A.2d 1075.
[10] We join the dissent's rejection of "the position taken by Justice Sanders in his concurring opinion that attorney discipline is a punishment scheme and therefore is subject to the rule of lenity  a criminal law doctrine." Dissent at 1277. As we stated in In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 667 P.2d 608 (1983), "[b]ecause we are committed to the proposition that discipline is not imposed as punishment for the misconduct, then our primary concern is with protecting the public and deterring other lawyers from similar misconduct." Id. at 95, 667 P.2d 608.
[11] Haley does contend that the Board erred in concluding that his violation of RPC 1.7 was done knowingly, suggesting that he was merely negligent in failing to obtain written consent rather than oral consent. This argument is without merit. There is no intent element related to obtaining informed written consent, which either exists or does not. If written consent does exist, there is simply no violation of the RPCs, and the ABA Standards for imposing discipline are inapplicable.
[12] Haley agreed not to present argument regarding the "substantial delay" factor in consideration for an extension of time before review by the Board. Clerk's Papers at 371. However, substantial delay is an unchallenged finding by the hearing officer, and this court remains free to consider its effect.
[1] See Br. of Resp't Lawyer at 16: "Before contacting Mr. Highland directly, I studied the rule. Being a person of common intelligence, I relied on the plain meaning of the rule." See also Reply Br. of Resp't Lawyer at 10: "Counsel for the Bar Association repeatedly asserts that I did no legal research or insufficient legal research on Rule 4.2. This position could not be more wrong. I read the rule with great care before I took action." Finally, on page 11 of his reply, Haley said, "I studied the rule and it was perfectly clear on the issue before me. Under modern rule of law, this meant that there was no reason to do more research."
[2] Connally v. Gen. Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).