

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

GEOFFREY CHISM,                      )
                                     )    DIVISION ONE
    Appellant/Cross-Respondent,  )
                                     )    No. 72844-0-I
          v.                 )
                                     )    PUBLISHED OPINION
TRI-STATE CONSTRUCTION, INC.,        )
and LARRY AGOSTINO,                  )
                                     )
    Respondents/Cross-Appellants,  )    FILED: May 9, 2016
_____ )

DWYER, J. — Following a month-long jury trial, attorney Geoffrey Chism

was awarded $750,000 for breach of two compensation contracts by his former

employer, Tri-State Construction, Inc., and exemplary damages for unlawful

wage withholding. The trial court then dramatically reduced Chism's recovery,

premised on findings that Chism violated Washington's Rules of Professional

Conduct (RPCs) during his time as Tri-State's in-house general counsel. By

ordering disgorgement of Chism's wages based on novel interpretations of

several RPCs, the trial court exceeded the disciplinary authority delegated to it by

our Supreme Court. Moreover, the trial court disregarded the strong legislative

policy preference in favor of payment of earned wages by failing to even

acknowledge that, unsupported by precedent, it was ordering disgorgement of an

attorney's *wages*, as opposed to an attorney's *fee*. Accordingly, we reverse the trial court's challenged rulings and remand the cause for entry of judgment consistent with the jury's verdict.

I

### 1. Background[1]

Tri-State Construction, Inc. (Tri-State) is a closely held construction firm that provides general contractor services. Ron, Tom, and Larry Agostino[2] are the current owners and corporate directors of Tri-State. Their father, Joe, formed the company in the late 1950s and eventually turned the company over to his sons, appointing Ron, the middle son, as president in 1996. Larry and Tom joined Ron as members of Tri-State's board of directors (Board) sometime in the mid-2000s. Findings of Fact 1, 3.

Chism began working with Tri-State as outside counsel in the early 1980s. Over the next three decades, Chism developed relationships of mutual trust and loyalty with Joe and Ron. During that time, Chism became Tri-State's primary attorney, performed the majority of the company's general legal work, and was perceived by himself and Tri-State as the company's general counsel. He initially reported to Joe, and later reported to Ron when Ron became president. Finding of Fact 2.

---

[1] Our recitation of facts is, essentially, an abridged version of the trial court's factual findings. While Chism assigns error to many of the trial court's findings, he does not persuasively contest that any of them are unsupported by substantial evidence.

[2] To avoid confusion, the Agostinos are referred to by their given names.

### 2. Chism represents Tri-State as outside counsel

Chism's financial arrangement with Tri-State changed several times over his long relationship with the company. Finding of Fact 4. For the first two decades, Chism billed Tri-State for legal services on an hourly basis under a conventional billing arrangement. Finding of Fact 5. In late 2002, Chism began charging a flat monthly fee for non-litigation matters while continuing to bill litigation matters separately on an hourly basis. Finding of Fact 6.

Chism memorialized this new arrangement in a December 2002 letter to Ron. Therein, Chism set forth the parties' understanding that the non-litigation matters, which were characterized as "General Counsel" (GC) services, were expected to be "far-reaching and broadly encompassing" and included "all of [Mr. Chism's] personal time on all matters . . . other than matters that are in formal dispute resolution." Finding of Fact 6. Consistent therewith, Chism repeatedly testified at trial to his understanding that, under the GC arrangement, he would "do whatever it took" and "whatever Tri-State asked" under the flat monthly fee billing arrangement. Findings of Fact 7, 17.

The December 2002 letter did not refer to Chism's hourly rate or indicate whether his services under the retainer were expected to be limited to a specified number of hours or in any other way, other than that they would not include litigation and other matters in formal dispute resolution, for which Chism would continue to bill by the hour.[3] Finding of Fact 8. Despite Chism's trial testimony that the monthly retainers were based on an understanding that Chism would

---

[3] Indeed, after the inception of the monthly retainer, Chism continued to track his time spent on Tri-State litigation matters and to submit detailed monthly invoices showing time worked and tasks performed on those matters. Finding of Fact 9.

spend an average of approximately 1.5 hours per day on Tri-State matters, the trial court found that "[t]here was no credible or persuasive evidence that Mr. Chism's flat monthly fee arrangement was ever tied to him working an average number of hours per day, week, or month."[4] Finding of Fact 17.

Chism's flat fee began at $10,000 per month in November 2002. Finding of Fact 8. In January 2005, Chism increased the monthly GC retainer to $12,000 per month. Finding of Fact 12. By July 2007, Chism also began charging a separate monthly flat fee for "Joint Venture/Design Build/405" (JV) GC services. The fees for those were $2,000 per month, as of July 2007, and $5,000 per month, as of October 2007. Thus, as of October 2007, Chism's total flat monthly fee was $17,000, comprised of $12,000 for GC services and $5,000 for JV GC services. Finding of Fact 14. During this time, Chism's hourly rate for Tri-State litigation matters increased from $325 in November 2002 to $500 in June 2008. Findings of Fact 8, 15.

Chism did not create any documentation similar to the December 2002 letter regarding the increases in his GC retainer, the initiation of the JV retainer, or the increase in that retainer. He testified that the scope of his work under both retainers was always that he would do whatever it took and whatever he was asked to do. In addition, Chism testified that all the retainer amounts since 2002 were intended to be a good deal for Tri-State—that is, they were supposed to

---

[4] Notably, Chism's purported understanding that the retainer amount was based on an anticipated number of hours of non-litigation work per week is not necessarily contrary to his repeated statements that he intended the retainer to cover whatever Tri-State wanted him to do. In fact, the likelihood that "whatever it takes" actually stood for a rough estimate of anticipated hours is reflected in the fact that, when Chism was required to spend additional time, the parties agreed to him receiving an additional flat monthly fee.

cover more hours than a simple division of the retainer by Chism's hourly rate. Finding of Fact 16.

### 3. Chism moves in-house at Tri-State

Sometime in 2008, Chism told Ron that he was planning to leave his law firm and work for a few existing clients out of his home. Chism proposed that he become a Tri-State employee and provide his services to the company as in-house GC. Chism preferred becoming an employee as opposed to continuing as outside counsel because he wanted healthcare coverage and did not want to deal with obtaining coverage on his own. He also considered it important that he not be required to keep timesheets. Finding of Fact 22.

Chism proposed that Tri-State pay him an annual salary of $190,000. He testified that he came up with that number by multiplying $17,000, the monthly total of his two retainers, by 12, then reducing the $204,000 annual total by $14,000 to reflect the extra costs of healthcare and taxes that he estimated the company would have to pay as a result of his becoming its employee. Finding of Fact 23. Similar to his work as outside counsel, Chism's employment arrangement with Tri-State did not provide for or otherwise contemplate the payment of any bonuses to him, annual or otherwise. Finding of Fact 28.

At the time of Chism's hiring, the parties did not discuss the number of hours that he would be expected to work. Finding of Fact 25. Chism assured Ron that he would continue to do "whatever it t[ook]," other than litigation work, for which Tri-State would need to hire outside counsel. Chism and Ron understood that there would be no significant changes in the general parameters

of the arrangement established in the December 2002 letter, other than that Chism would now be an employee and be paid a salary and basic benefits rather than monthly retainers. Finding of Fact 26.

Ron informed Tri-State's controller, Kristi MacMillan, that Chism was becoming a full-time Tri-State employee. MacMillan understood that to mean that Chism generally would be working 40 hours per week, and she enrolled him to receive Tri-State healthcare coverage, showing him as working 40 hours per week. Tri-State's health plan required employees to work at least 32 hours per week to be eligible. MacMillan testified that she would not have enrolled Chism for healthcare benefits or have shown him as working 40 hours per week if she had known that he was expected to work only part time. Finding of Fact 27.

Once he moved in-house, Chism did not track or record the matters he worked on or the time he spent on them because his salary covered all of his work—litigation and non-litigation tasks, legal and non-legal tasks, and paralegal or associate and partner-level tasks. Findings of Fact 29-30. He did not work a regular schedule. For the first couple of years as an employee, Chism worked primarily from his home or other locations, and he continued to do so throughout his employment with Tri-State. Finding of Fact 30.

4. *Tri-State agrees to modify Chism's compensation structure and awards him a $310,000 bonus for fiscal year (FY) 2010.*

In September 2010, after serving as an in-house lawyer for approximately 20 months, Chism proposed a new salary arrangement. Pursuant to this proposal, retroactive to January 1, 2010, in addition to his base salary and benefits, Chism would be eligible for a discretionary bonus. Chism testified that

he presented the proposed arrangement to Ron as being more beneficial to Tri-State than simply raising his salary because he would be paid for only the time he actually worked, he would be paid for any extra hours only at the end of the fiscal year, and the amount of any bonus would be solely within Ron's discretion. Finding of Fact 38.

Ron agreed to the new arrangement. Chism drafted their agreement and e-mailed it to Ron (September 2010 memo). Ron initialed a copy. Finding of Fact 39.

The September 2010 memo began by stating that Chism's $190,000 annual salary was based on working part-time at 1.5 hours per day, not full-time.

> My current compensation, which believe it or not we originally set over ten years ago, is based on me spending an average of less than an hour and a half a day on Tri-State matters, or about seven hours a week. It has always taken a little more than that to get things done but, until the last year or two, I think the arrangement worked well for both of us. Needless to say, for the past couple of years the time requirements have been a little more demanding.

Finding of Fact 40.

This was the first time that one of Chism's e-mails stated that his compensation was based on a particular number of hours. Ron testified that he was not aware at the time that he received the September 2010 memo of a 7.5-hour per week base for Chism's salary.

> The memo then addressed the discretionary bonus process.
>
> Immediately prior to the end of Tri-State's fiscal year I will give you my best estimate of the total amount of time I spent during that year on Tri-State matters. I will defer to your judgment as to what bonus/adjustment you feel is appropriate to compensate for any effort over the 1.5 hour a day base. You can make the bonus/adjustment any time you want so as to include it in either the

past or upcoming fiscal year. I am a calendar year taxpayer so the timing doesn't make any difference to me.

Finding of Fact 42.

Under the new bonus structure, at the end of each fiscal year (September 30), Chism would submit an annual "best estimate" of the time he spent on all Tri-State matters and Ron would use his judgment to determine an "appropriate" "bonus/adjustment" to compensate Chism for work done over the "1.5 hour a day base." Finding of Fact 43. Chism interpreted "best estimate" to mean that, consistent with his practice as in-house counsel, he was free not to track or record his time in any formal way. Finding of Fact 63.

In addition, according to the September 2010 memo, Tri-State would reimburse Chism for his bar dues, professional insurance premiums, cellular telephone and e-mail data charges, and continuing legal education expenses retroactive to FY 2010. Tri-State would also provide Chism a company car and, until the car was provided, would reimburse him for his gas, maintenance, repairs, and insurance for use of his own vehicle. Finding of Fact 48.

As part of the September 2010 agreement, Chism and Ron also agreed that Tri-State would award a bonus to Chism for his past work during the previous fiscal year (FY 2010). This bonus was calculated under the new bonus structure. Finding of Fact 46.

Chism provided the hours estimate for FY 2010 in a September 30, 2010 e-mail.

> As per our recent discussion regarding my compensation, we
> agreed that I would provide you with an estimate of the actual time I

spent on Tri-State matters at the end of your fiscal year, September 30. . . .

The reference to the 1.5 hour a day base is to the fact that my base compensation was originally set on the assumption that I would average about 1.5 hours a day, or 380 hours a year on Tri-State matters at my old hourly billing rate of $500 per hour.

This has been, as you know, a pretty busy year. In addition to the routine issues, I have spent a considerable amount of time on several somewhat out-of-the ordinary matters . . . .

As we discussed this morning, realistically I have probably been averaging something over 60% of a normal work day on your matters. To be conservative, let's call it 50%. That translates into 1,000 hours of time, of which 380 hours have been covered by my base compensation.

As I have said, I defer to you and your sense of fairness to make whatever adjustment you think is right.

Finding of Fact 46.

The trial court found that, "[a]lthough not actually stated, Mr. Chism's memo essentially requested a $310,000 bonus: 1,000 hours minus 380 hours times $500 an hour." Finding of Fact 47. Indeed, Tri-State calculated Chism's bonus using the identical numbers provided by Chism in his September 30, 2010 e-mail: 620 excess hours (1,000 - 380) x $500/hour rate, or $310,000. Tri-State paid the $310,000 bonus to Chism in three installments. Finding of Fact 62.

Ron forwarded both September e-mails to Larry and Tom. Findings of Fact 39, 61. Subsequently, at its annual meeting, Tri-State's Board of Directors ratified and confirmed "all corporate activity since the last annual meeting and business decisions of the Corporation's officers, directors and shareholders, while acting for the Corporation." Finding of Fact 70.

The trial court found that the "underpinnings" cited by Chism in the September 2010 memo and the September 30 e-mail "were inaccurate in several key respects." Finding of Fact 49.

> First, Mr. Chism's claim that his current compensation had been set over ten years ago was not accurate. Mr. Chism's retainer arrangement did not even begin until late 2002, or eight years prior to September 2010. But more importantly, Mr. Chism's "current compensation" of $17,000 a month was based on his monthly retainer set in October 2007, which was only 15 months before he went in-house. During those fifteen months, Tri-State only paid him $500 an hour for the last six months . . . . Mr. Chism was far more familiar with his rate history than Tri-State.
>
> . . . Second, Mr. Chism's claim that his retainer arrangement with Tri-State equated to him spending an average of less than an hour and a half a day on Tri-State matters, or about seven hours a week was contrary to his repeated testimony that in exchange for the retainer, he would do whatever Tri-State wanted no matter how long it would take. That Mr. Chism's retainer was not based on an expectation of his spending less than an average of an hour and a half a day or about seven hours a week on Tri-State matters finds further support in the fact that . . . Mr. Chism's hourly rate would increase without a commensurate increase in the retainer, and his retainer would increase without a commensurate increase in his hourly rate[.] . . .
>
> . . . Even assuming that he based his monthly retainer on the assumption that he would work a certain number of hours a day, he never worked less than an average of an hour and a half a day or about seven hours a week, with the exception of a ten month period from March 2004 to January 2005. And during the critical time when his "current compensation" was $17,000 a month, dividing that retainer by his hourly rate would mean that Mr. Chism worked anywhere from 2.13 hours per day/10.6 hours a week to 1.7 hours per day/8.5 hours a week.[5]

---

[5] We note that the basis for the trial court's calculations is unclear and the results appear to be incorrect. If Chism's $17,000 monthly retainer is divided by his $400 hourly rate from October 2007, the result is 42.5 hours per month, which is approximately 9.77 hours per week or 1.95 hours per day. If Chism's $17,000 monthly retainer is divided by his $500 hourly rate from June 2008, the result is 34 hours per month, which is approximately 7.82 hours per week or 1.56 hours per day.

. . . Finally, Mr. Chism mischaracterizes his salary as "originally set on the assumption that I would average about 1.5 hours a day, or 380 hours a year on Tri-State matters at my old hourly billing rate of $500 per hour." Were the cost of his benefits included, Mr. Chism would actually owe 408 hours a year ($204,000 ÷ $500/hour), not 380 hours. Mr. Chism subtracts his salary, not his salary with benefits, when he subsequently provides his estimate of hours worked for the bonuses described below, thus effectively double-charging Tri-State for benefits.

Findings of Fact 49-52.

The trial court believed that

Mr. Chism crafted his September 2010 memo and September 30, 2010 emails as though the new arrangement he sought was a direct outgrowth of his and Tri-State's longstanding practice, which convinced Ron that Tri-State owed Mr. Chism more money for the same work that Mr. Chism had earlier agreed to perform for a fixed salary—including the work Mr. Chism had already performed in FY 2010. In so doing, Mr. Chism laid the foundation for seeking compensation that exceeded even what he would have been paid as outside counsel, while enjoying the guaranteed income, benefits, and freedom from timekeeping of his inside-counsel position.

Finding of Fact 53.

The trial court also found that Chism's estimate of his hours for FY 2010, offered in his September 30, 2010 e-mail to Ron as justification for a $310,000 bonus, "[wa]s not reliable." Finding of Fact 65.

   5. *Chism takes over as president of Tri-State's Canadian subsidiary; Tri-State awards him a $500,000 bonus for FY 2011*

In April 2010, Ron was diagnosed with early onset Alzheimer's disease. Finding of Fact 108. By the summer of 2011, Chism observed that Ron's health condition and memory lapses were noticeably impacting his ability to run Tri-State. Finding of Fact 72. Chism suggested that, due to his condition, Ron would likely need to step down as president of Tri-State. Chism also advised the

Agostino brothers that Tri-State had a fiduciary duty to inform its partners in a major, ongoing Canadian project about Ron's health.  Finding of Fact 73.

Chism offered to replace Ron as president of the joint venture running the Canadian project, TRP Contractors, Inc. (TRP).  Ron and Tom agreed and, in mid-October 2011, appointed Chism as TRP's president.  Chism did not request any additional compensation for taking on the TRP president position and its attendant responsibilities.  Finding of Fact 78.

During FY 2011, Tri-State had a net loss of approximately $27 million, largely attributable to the Canadian project.  During FY 2011 and FY 2012, Chism's efforts and acumen helped Tri-State to stay in business, preserve its bonding capacity, and avoid default on that project, which, in turn, could have cost Tri-State a minimum of $27 million.  Tri-State's bonding company's representative, Eric Mausolf, testified that Tri-State's risk of failure on the Canadian project was substantial and that, with the fate of Tri-State on the line, Chism capably handled the troubled project on behalf of Tri-State.  Finding of Fact 79.  The trial court found that "Tri-State exists today because it survived the crisis associated with the Canadian project and it survived that crisis in large part due to Mr. Chism's efforts and hard work."  Finding of Fact 80.

On October 21, 2011, when Chism and Ron were driving back from a meeting in Vancouver, B.C. related to the Canadian project, Chism raised the issue of a bonus for FY 2011.  Chism did a spontaneous calculation of the hours that he had worked during the previous year, multiplied them by $500, subtracted his salary from this total, and proposed a bonus of $500,000.  Chism testified that

Ron agreed to his proposal. Finding of Fact 81. However, Ron testified that he told Chism that, due to the company's financial difficulties, he could not pay him a bonus (much less the proposed sum) until a pending legal claim was successfully settled. Finding of Fact 82.

Chism drafted an agreement memorializing the terms of their discussion in the car (November 2011 memo). The memo stated that Chism's bonus arrangement, which was meant to "account for the additional time spent which was not anticipated in our longstanding flat compensation arrangement," had been operating for "the last couple of years."[6] Chism acknowledged in the memo that, due to Tri-State's limited cash availability, he did not "expect any accrued supplement/bonus" to be paid until the following year and that he was "happy to wait until cash [wa]s available." Finding of Fact 83. The memo did not make payment of the bonus conditional on successful settlement of the legal claim but, instead, stated that Chism did not expect any bonus to be paid until the next year, "maybe out of the [anticipated] settlement." The memo also stated that Ron had already indicated that he thought the proposed $500,000 bonus was fair. Finding of Fact 84. Finally, the memo stated that Ron should let Chism know if he recalled their conversation differently. Ron signed the memo. Finding of Fact 85.

The trial court found that, as with his request for a $310,000 bonus for FY 2010, Chism did not demonstrate that he had a reliable basis for estimating his hours worked in FY 2011. Finding of Fact 89.

---

[6] The trial court found that this last statement was not accurate, as Chism had just initiated the arrangement regarding a possible bonus one year earlier. Finding of Fact 83.

In a meeting in mid-January 2012 regarding the company's financial issues, MacMillan said something needed to be put on the books reflecting Chism's bonus so that the FY 2011 financial statement could be completed. Up to that time, the Agostinos had not agreed to book any amount for a FY 2011 bonus for Chism, but they agreed to add $400,000 as a liability owed to Chism. Finding of Fact 92. In follow up to the January 2012 meeting, on February 6, 2012, MacMillan recorded $400,000 as "wages" owed to Chism in Tri-State's general ledger. Finding of Fact 93.

Tri-State never paid the $500,000 bonus memorialized in the November 2011 memo. Finding of Fact 107.

### 6. Larry succeeds Ron; Chism negotiates for a mid-year bonus in March 2012

Larry succeeded Ron as Tri-State's president in March 2012. Soon thereafter, Larry met with Chism to discuss his FY 2011 bonus and the possibility of a mid-year bonus for FY 2012. Finding of Fact 97. Regarding FY 2011, Larry told Chism that he would have a hard time collecting the $500,000 bonus because he had taken advantage of Ron to obtain the agreement. Finding of Fact 99.

Regarding FY 2012, Chism stated that he had worked enough hours in the past six months to have earned himself a bonus of from $500,000 to $750,000, as measured with reference to his $500 hourly rate.[7] Chism and Larry negotiated and, eventually, Chism said that he would accept a $250,000 bonus

---

[7] The trial court found that, as with his previous estimates of his hours, Chism's estimate regarding how many hours he had worked in the first half of FY 2012 was not reliable. Finding of Fact 98.

for that time period and $300 per hour going forward, as long as he was paid a minimum salary of $1,500 per week. Chism also wanted ownership of his company computer, cell phone, and the company automobile when he left Tri-State. Larry appeared to agree. Finding of Fact 101. Chism said he would prepare a memo reflecting their agreement before he left on vacation the following day. Finding of Fact 103.

As promised, Chism drafted a memo memorializing the agreement. Finding of Fact 103. Chism subsequently revised a single provision and resent the agreement to Larry the following day (March 2012 memo). Each of Chism's e-mails concluded by stating that, if Larry found the contents of the memo to be consistent with their discussion, he should initial two copies of the memo. Finding of Fact 104.

Larry reviewed the e-mails and wrote back to object only to the provision stating that, upon Chism's departure from the company, Tri-State would give him the computer, cell phone, and car. Larry disputed that he had agreed to the transfer of the car and other property and told Chism that he would have to deduct $50,000 from the payment they had discussed if Chism wanted the automobile. Larry did not object to any of the other terms. Finding of Fact 105.

On April 10, 2012, Chism and Larry met to follow up on the issue of Chism's compensation. Chism said that they should get the matter settled. Larry responded that there was no need to talk about it, as Tri-State was unwilling to provide Chism the additional compensation that they had discussed. When Chism asked about the $500,000, Larry said that he understood it to be an open

issue. Chism said that under the circumstances, he would have to resign. He did so the same day. Finding of Fact 107.

Tri-State never paid Chism the $250,000 bonus. Finding of Fact 107.

7. *Chism sues Tri-State; Tri-State asserts defenses to enforcement and counterclaims seeking disgorgement of any compensation found owing to Chism*

Chism sued Tri-State and Larry to recover the $750,000 in unpaid bonuses, coupled with exemplary damages due to Tri-State's willful withholding of his wages. Tri-State counterclaimed, asserting common law breach of fiduciary duty and violations of RPCs 1.5, 1.7, 1.8, and 8.4.[8] The same claims were also asserted as defenses to enforcement of the bonus contracts. In addition, Tri-State asserted an undue influence defense related to Ron's Alzheimer's. Finding of Fact 108.

Chism's contract and wage withholding claims were tried to a jury, as was Tri-State's undue influence defense. Because they were based on the RPCs, the remainder of Tri-State's claims and defenses were tried to the court. The exceptions were those based on RPC 1.5, which were dismissed pretrial. Finding of Fact 109. At Chism's suggestion, the trial court also obtained advisory opinions from the jury pursuant to CR 39(c)[9] related to whether, assuming that it should be understood as an attorney fee contract entered into after an attorney-

---

[8] Tri-State styled this as a claim for "breach of fiduciary duty based on violations of professional conduct rules."

[9] CR 39(c) provides: "**Advisory Jury and Trial by Consent.** In all actions not triable of right by a jury the court, upon motion or of its own initiative, may try an issue with an advisory jury or it may, with the consent of both parties, order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right."

client relationship existed, the September 2010 modification was enforceable.[10] Findings of Fact 111-112.

After a month-long trial, the jury found that Chism had proved his contract claims for the FY 2011 bonus of $500,000 and the FY 2012 bonus of $250,000, awarding $750,000 to Chism. It also found that Tri-State had willfully withheld these wages, subjecting it to double damages and attorney fees, pursuant to RCW 49.52.070, and an award of attorney fees pursuant to RCW 49.48.030. The jury found that the undue influence defense was not proved. Finding of Fact 112. The jury also answered all three advisory questions in Chism's favor.

Several months later, the parties reconvened for the trial court to decide Tri-State's remaining counterclaims and defenses. In addition to the trial testimony heard by the jury, the court also considered the testimony of expert witnesses for both Chism and Tri-State on the subject of a lawyer's common law

---

[10] The jury was asked the following questions on the verdict form:
**QUESTION 1**: With respect to Mr. Chism's contention that an enforceable contract arose between himself and Tri-State in or around September of 2010 regarding a modification of his compensation arrangement, whether predicated on Exhibit 9 or otherwise, do you find that Mr. Chism has proven, by a preponderance of the evidence, that the contract was fair and reasonable?
**QUESTION 2**: With respect to Mr. Chism's contention that an enforceable contract arose between himself and Tri-State in or around September of 2010 regarding a modification of his compensation arrangement, whether predicated on Exhibit 9 or otherwise, do you find that the [sic] Mr. Chism has proven, by a preponderance of the evidence, that the contract was free from undue influence?
**QUESTION 3**: With respect to Mr. Chism's contention that an enforceable contract arose between himself and Tri-State in or around September of 2010 regarding a modification of his compensation arrangement, whether predicated on Exhibit 9 or otherwise, do you find that the [sic] Mr. Chism has proven, by a preponderance of the evidence, that he made a full and fair disclosure of the facts upon which the contract was predicated?
Finding of Fact 112.
The questions relate to the requirements for modifying attorney fee contracts during the course of the attorney-client relationship set forth in Kennedy v. Clausing, 74 Wn.2d 483, 490-91, 445 P.2d 637 (1968). There is some question as to the continued relevance of the Kennedy requirements independent of the requirements of RPC 1.8 given the significant overlap between the two. See Valley/50th Ave., LLC v. Stewart, 159 Wn.2d 736, 743-44, 153 P.3d 186 (2007) (addressing the Kennedy requirements in a discussion of RPC 1.8).

fiduciary duties and RPC-based professional obligations, which had been given at trial, outside of the jury's presence. Finding of Fact 110.

The trial court subsequently entered findings and conclusions, reflecting its determination that Chism had committed numerous RPC violations. It declined to void the bonus contracts, concluding that Chism was entitled to recover for Tri-State's breach of his employment agreement. However, it also concluded that Chism must disgorge $550,000 of the $1,060,000 in bonuses to which he otherwise would have been entitled. Finding of Fact 85.

For FY 2011, the jury had awarded Chism $500,000; the trial court reduced that amount by $165,000. For FY 2012, the jury had awarded Chism $250,000; the trial court reduced that amount by $113,000. The trial court also reduced Chism's FY 2010 bonus from $310,000 to $38,000. Because Tri-State had already paid Chism the $310,000, Tri-State was required to pay Chism only an additional $200,000. The trial court also determined that Chism was entitled to recover double damages, pursuant to RCW 49.52.070, on the net wage award (after disgorgement) and receive an award of reasonable attorney fees, pursuant to RCW 49.48.030 and RCW 49.52.070. Chism appealed to this court. Tri-State cross-appealed.

Subsequently, the trial court entered findings of fact and conclusions of law awarding Chism the overwhelming bulk of the attorney fees that he incurred in prosecuting his wage claims. The court rejected Tri-State's contention that the fees awarded as a result of its deliberate withholding of Chism's wages should be reduced in light of the trial court's fiduciary duty rulings. The trial court entered

judgment on April 24, 2015 to reflect its fee decision. Both Chism and Tri-State filed amended notices of appeal from that judgment.

## II

Based on several alleged violations of the RPCs, the trial court effectively ordered disgorgement of $1.1 million of the total damage award to which Chism was entitled pursuant to the jury's verdict.[11] We begin by examining the source of, and any limitations to, the trial court's power to enter such an order.

"[T]he regulation of the practice of law in [Washington] is within the inherent power of [the Supreme Court]."[12] Graham v. State Bar Ass'n, 86 Wn.2d 624, 631, 548 P.2d 310 (1976). Indeed, "[t]he Supreme Court has an exclusive, inherent power to admit, enroll, discipline, and disbar attorneys." Short v. Demopolis, 103 Wn.2d 52, 62, 691 P.2d 163 (1984). "[T]he exercise of 'this power is necessary for the protection of the court, the proper administration of justice, the dignity and purity of the profession, and for the public good and the protection of clients.'" Demopolis, 103 Wn.2d at 62 (internal quotation marks omitted) (quoting City of Seattle v. Ratliff, 100 Wn.2d 212, 215, 667 P.2d 630 (1983)).

---

[11] The jury's verdict supported a total award of $1.5 million, the sum of $750,000 in unpaid bonuses and $750,000 in exemplary damages for unlawful wage withholding. Pursuant to the trial court's judgment, Chism was awarded a total of $400,000, comprised of $200,000 in net unpaid bonuses and $200,000 in exemplary damages.

[12] This authority derives from the state constitution and separation of powers principles. See, e.g., Kommavongsa v. Haskell, 149 Wn.2d 288, 311, 67 P.3d 1068 (2003) ("[O]ur state constitution vests the judicial power of the State in this court. CONST. art. IV, § 1. Under this provision the power of the Supreme Court to regulate the practice of law is inviolate."); Short v. Demopolis, 103 Wn.2d 52, 62, 691 P.2d 163 (1984) (considering whether the application of the CPA to the practice of law "would be an unconstitutional legislative invasion of the jurisdiction of the Supreme Court in its power to regulate the practice of law").

"[P]ursuant to its power to regulate the practice of law within [Washington]," our Supreme Court adopted the RPCs. Hizey v. Carpenter, 119 Wn.2d 251, 261, 830 P.2d 646 (1992). "The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." RPC Scope cmt. 20. Although all lawyers admitted to practice in Washington are bound by the RPCs, Rules for Enforcement of Lawyer Conduct (ELCs) 1.2, the individual rules do not apply uniformly to all lawyers. See, e.g., RPC 1.11 (concerning only government lawyers).

"Failure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process." RPC Scope cmt. 19. The disciplinary process procedure is governed by the ELCs,[13] which provide for a variety of sanctions (e.g., disbarment and suspension) and remedies (e.g., restitution and probation) "[u]pon a finding that a lawyer has committed an act of misconduct" in violation of the RPCs. ELC 13.1.

Apart from this formal, public process, "[the Rules] are not designed to be a basis for civil liability." RPC Scope cmt. 20. Indeed, "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." RPC Scope cmt. 20. Thus, "[t]he fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." RPC Scope cmt. 20.

---

[13] ELC 1.1 ("[The ELCs] govern the procedure by which a lawyer may be subjected to disciplinary sanctions or actions for violation of the [RPCs].").

Nevertheless, violations of the RPCs may be relevant to litigation between private parties. In particular, pursuant to its inherent disciplinary power, our Supreme Court has authorized lower courts to impose certain "public remedies" for RPC violations in the context of ongoing litigation.[14] See Hizey, 119 Wn.2d at 259 ("[B]reach of an ethics rule provides only a public, e.g., disciplinary, remedy and not a private remedy."). For example, courts may determine that a violation of the RPCs in the formation of a contract renders that contract unenforceable as violative of public policy.[15] LK Operating, LLC v. Collection Grp., LLC, 181 Wn.2d 48, 85, 331 P.3d 1147 (2014); accord Valley/50th Ave., LLC v. Stewart, 159 Wn.2d 736, 743, 153 P.3d 186 (2007).

Courts may also deny or disgorge attorney fees in response to an RPC violation. Eriks v. Denver, 118 Wn.2d 451, 462, 824 P.2d 1207 (1992) ("The general principle that a breach of ethical duties may result in denial or

---

[14] Consistent with the principle that attorney discipline falls within the exclusive province of the judiciary, whether an attorney violated an RPC is a question of law for the court to determine. See Eriks v. Denver, 118 Wn.2d 451, 457-58, 824 P.2d 1207 (1992).

While the burden of proof for establishing an RPC violation outside of disciplinary proceedings does not appear to have been directly addressed, the disciplinary procedural rules provide that violations must be established by a "clear preponderance of the evidence." ELC 10.14(b); accord In re Disciplinary Proceeding Against Marshall, 160 Wn.2d 317, 330, 157 P.3d 859 (2007). In seeking advisory opinions from the jury in this case, the trial court instructed the jury on the preponderance of the evidence (or "fair preponderance of the evidence") standard from Kennedy, 74 Wn.2d at 499.

[15] The Supreme Court explained the relationship between the RPCs and public policy as follows:

Because "the Supreme Court['s power] to regulate the practice of law is inviolate," this court has legal authority to set public policy in the context of attorney ethics. Kommavongsa v. Haskell, 149 Wn.2d 288, 311, 67 P.3d 1068 (2003). The RPCs are clearly directed at promoting the public good and preventing public injury . . . . It would also make little sense to say that a judicial decision in a particular case may set public policy, but a carefully drafted set of ethical rules promulgated by the only body with the authority to set such rules may not. It is therefore possible, as a general matter, to find principles of public policy relevant to the enforceability of contracts in the RPCs.

LK Operating, LLC v. Collection Grp., LLC, 181 Wn.2d 48, 86-87, 331 P.3d 1147 (2014) (first alteration in original).

disgorgement of fees is well recognized."); accord Behnke v. Ahrens, 172 Wn. App. 281, 298, 294 P.3d 729 (2012) (stating that "[d]isgorgement of fees is a reasonable way to discipline specific breaches of professional responsibility, and to deter future misconduct of a similar type," and holding that it was proper for the trial court to limit the sanction for an RPC violation to disgorgement of fees paid); Cotton v. Kronenberg, 111 Wn. App. 258, 272, 275, 44 P.3d 878 (2002) (holding that a trial court order disgorging all fees paid was a proper consequence of an attorney's RPC violation). Consistent with the principle that disgorgement is meant to redress a public wrong, a party seeking disgorgement need not establish either damage or causation related to the alleged RPC violation.[16] Eriks, 118 Wn.2d at 462.

It bears repeating that the Supreme Court's disciplinary authority is "plenary."[17] Indeed, this plenary authority is the source of the disciplinary authority exercised by all other actors, including other courts and the Washington State Bar Association (WSBA).[18] See ELC 2.1 ("Persons carrying out the

---

[16] Because the disgorgement sanction is untethered to an opposing party's injury, any private benefit derived from its imposition is necessarily a windfall.

This is unlike the restitution remedy available in disciplinary proceedings, which is tied directly to harm suffered by the party to be compensated. See, e.g., Marshall, 160 Wn.2d at 350 ("A lawyer subject to discipline may be ordered to make restitution to persons financially injured by the lawyer's conduct."); In re Disciplinary Proceeding Against Longacre, 155 Wn.2d 723, 734, 122 P.3d 710 (2005) (Disciplinary Board declined to impose restitution because it found that client did receive value from attorney's representation).

[17] As the Supreme Court has explained, in the disciplinary context, it has "'the inherent power to promulgate rules of discipline, to interpret them, and to enforce them.'" In re Disciplinary Proceedings Against Haley, 156 Wn.2d 324, 333, 126 P.3d 1262 (2006) (quoting In re Disciplinary Proceeding Against Stroh, 97 Wn.2d 289, 294, 644 P.2d 1161 (1982) (emphasis added)). Thus, unlike in other contexts, in the context of attorney discipline, the Supreme Court exercises its authority both top-down, as the author of the RPCs, and bottom-up, as an error correction court.

[18] It is said that a disgorgement order is "within the inherent power of the trial court to fashion judgments." Eriks, 118 Wn.2d at 463. This is true, but the trial court's authority to order disgorgement as discipline for attorney misconduct derives from the Supreme Court's authority to regulate the practice of law.

- 22 -

functions set forth in these rules act under the Supreme Court's authority."). Because the disciplinary authority of these actors derives from the Supreme Court's authority, such authority must be exercised consistently with the manner in which the Supreme Court elects to exercise its own authority. Were it otherwise, the Supreme Court's disciplinary power would not truly be "inviolate." See Kommavongsa v. Haskell, 149 Wn.2d 288, 311, 67 P.3d 1068 (2003). Moreover, to permit superior courts to impose disciplinary penalties in circumstances in which the Supreme Court would not do so would be to encourage the development of varying standards of professional conduct throughout the state's 39 counties.

It follows that, in order to evaluate whether a trial court's disciplinary action was proper, we must determine whether the court exercised its authority consistent with Supreme Court precedent. That is, we must determine whether the superior court properly limited its application of punishment to misconduct for which the Supreme Court would itself impose sanctions. In order to make this determination, we must give effect to the Supreme Court's own disciplinary practices.

Two of our Supreme Court's practices are particularly relevant to this case. First, disciplinary action must be based on one or more specific rule violation(s). See ELC 1.1 ("These rules govern the procedure by which a lawyer may be subjected to disciplinary sanctions or actions for violation of the [RPCs]." Though some of the RPCs are related to traditional lawyer-client fiduciary duties, see, e.g., RPC 1.8 cmt. 17 (the prohibition on lawyer-client sexual relationships

stems from the historical fiduciary relationship between the two), there is no possibility of imposing discipline based on a general claim of "breach of fiduciary duty."

Second, when a rule is "impermissibly vague" as to its applicability, a Supreme Court interpretation thereof applies prospectively only.[19] In re Disciplinary Proceedings Against Haley, 156 Wn.2d 324, 338, 126 P.3d 1262 (2006). Factors that contribute to a disciplinary rule being deemed impermissibly vague include "'the absence of clear guidance'" from the Supreme Court, the "absence of a prior decision from [the Supreme Court]," and "the presence of conflicting or equivocal authority from other jurisdictions and legal commentaries." Haley, 156 Wn.2d at 336, 338. This is consistent with the statement in the RPCs that "[t]he Rules presuppose that disciplinary assessment of a lawyer's conduct will be made . . . in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation." RPC Scope cmt. 19.

The Haley decision is instructive. Therein, an attorney who was representing himself pro se directly contacted the opposing party in that action, who he knew to be represented by counsel. Haley, 156 Wn.2d at 328-29. The Supreme Court was tasked with deciding whether attorney Haley's conduct violated RPC 4.2, which provides, "*In representing a client*, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has

---

[19] This practice avoids a looming due process problem. Haley, 156 Wn.2d at 335-36 (addressing the contention that the pertinent rule was "unconstitutionally vague, [thereby] violating [the attorney's] constitutional due process rights").

the consent of the other lawyer or is authorized to do so by law or a court order."

(Emphasis added.) Was Haley—proceeding pro se— "representing a client"

such that his conduct was subject to the rule? The court determined that Haley's

conduct was both subject to and violative of the rule in question but,

nevertheless, dismissed the related charge against him. Haley, 156 Wn.2d at

343. This was the appropriate resolution, the court announced, because there

was no guiding authority from the Supreme Court on the question, and pertinent

authority from other jurisdictions was equivocal. Therefore, the court held, its

interpretation of the rule was to be applied prospectively only. Haley, 156 Wn.2d

at 343; see also In re Disciplinary Proceeding Against Halverson, 140 Wn.2d

475, 491-92, 998 P.2d 833 (2000) (declining to find a violation of former RLD 1.1

(1997) ("Commission of Act of Moral Turpitude") because—at the time—"a bright-

line rule prohibiting attorney-client sexual relations does not exist").

A superior court may exercise its delegated disciplinary authority only in

response to misconduct for which the Supreme Court would itself impose

disciplinary sanctions. Accordingly, the superior court's authority to order

disciplinary remedies is limited to the subset of cases involving violations of the

RPCs in which the applicability of the cited RPC to the attorney's conduct has

been clearly established.

We bear this limitation in mind as we review the decision of the trial court

herein.

III

Tri-State alleged that Chism violated RPCs 1.5, 1.7, 1.8, and 8.4. The claim related to RPC 1.5 was dismissed on summary judgment. Thereafter, the trial court concluded that the remaining RPCs applied to Chism's conduct, determined that he had acted in violation of those rules, and ordered him to disgorge a significant portion of the wages that, according to the jury, he was owed.[20] We now examine, taking each rule in turn, whether the trial court was authorized to order disgorgement of wages based on the identified violations.

*RPC 1.5—Fees*

Tri-State contends, contrary to the superior court's order on summary judgment dismissing the claim, that Chism violated RPC 1.5 by negotiating substantial compensation in addition to his salary and benefits as in-house counsel.

"When interpreting the meaning of any RPC, . . . [o]ur goal is to give effect to the intent behind the rule, which we discern, where possible, from the plain language of the rule at issue in the context of the RPCs as a whole." LK Operating, 181 Wn.2d at 75. "'[I]t is fundamental that . . . we avoid absurd results.'" In re Marriage of McDermott, 175 Wn. App. 467, 488, 307 P.3d 717

---

[20] Tri-State also alleged, and the trial court agreed, that each of the rule violations that it identified also constituted a violation of a fiduciary duty that Chism owed to Tri-State as its attorney. However, breach of fiduciary duty is a separate common law cause of action, with specific, clearly established elements. Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 433-34, 40 P.3d 1206 (2002) ("The plaintiff [in a breach of fiduciary duty action] must prove (1) existence of a duty owed, (2) breach of that duty, (3) resulting injury, and (4) that the claimed breach proximately caused the injury."); see also 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: Civil 107.10 (6th ed. Supp. 2013). Tri-State neither alleged nor established at least two of those elements—causation and damages. Therefore, the trial court erred by concluding that Tri-State proved actionable breaches of fiduciary duties.

We focus, instead, on the alleged violations of particular RPCs, which could, in theory, be a proper basis for the trial court's disgorgement order.

(2013) (alterations in original) (quoting Lowy v. PeaceHealth, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012)).

RPC 1.5 provides, in pertinent part, "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee." RPC 1.5(a).

Tri-State's argument equivocates between "fees," the explicit object of the rule, and "wages," the type of compensation herein at issue.[21] This is contrary to the plain meaning and common usage of the words.[22] Moreover, Tri-State cites no authority—from Washington or elsewhere[23]—in support of its proposed expansion of the rule's application.

This lack of authority supporting Tri-State's position struck the trial court, which noted, in its order granting partial summary judgment dismissal of the RPC 1.5 claim,

> The Court concludes as a matter of law that Plaintiff's status as in house counsel renders the disgorgement of fees . . . based on alleged violations of RPC 1.5 unavailable as an affirmative defense or a counter-claim for the Defendants. No Washington case supports the Defendant's legal position on this issue.

In short, at the time that Chism negotiated his various compensation agreements, there was no clear guidance from our Supreme Court—or, indeed, from any court—as to the application of RPC 1.5 to wage contracts. Accordingly,

---

[21] This question was settled with finality by the jury's verdict, which Tri-State does not challenge on appeal.

[22] Webster's Third New International Dictionary defines "fee" in this sense of the word as "compensation often in the form of a fixed charge for professional service . . . <a lawyer's retainer fee>." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 833 (2002). "Wage" is defined as "a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services usu. according to contract and on an hourly, daily, or piecework basis and often including bonuses, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits." WEBSTER'S, supra, at 2568. In short, "wage" presupposes an ongoing employer-employee relationship, whereas "fee" suggests retaining a professional on a temporary basis for a specific, limited purpose.

[23] Foreign authority is potentially relevant to our understanding of the rules herein at issue because the pertinent sections mirror the American Bar Association model rules.

the superior court properly granted summary judgment in Chism's favor on Tri-State's claim for disgorgement based on the alleged violation(s) of RPC 1.5.

*RPC 1.7—Conflict of Interest: Current Clients*

Tri-State alleged, and the trial court agreed, that Chism violated RPC 1.7 when he requested the $500,000 bonus for FY 2011 and, again, when he advised Larry that Tri-State owed him that bonus.[24]

---

[24] Specifically, the trial court concluded, in pertinent part:
44. Mr. Chism breached his fiduciary duty to Tri-State, in violation of RPC 1.7, by requesting that Tri-State pay him $500,000 for FY 2011[ ]and indicating that was reasonable, where: (a) Mr. Chism, as Tri-State's GC and only in-house lawyer, was also advising Tri-State in connection with the company's severe financial difficulties; (b) paying such an amount of money to Mr. Chism would have been counter to Tri-State's best interests given its financial straits; (c) the bonus in question served to further only Chism's personal financial interest; (d) Mr. Chism knew that Ron trusted him and would believe anything he proposed was reasonable and in Tri-State's interest; (e) Mr. Chism took no steps to advise Tri-State that it was not legally obliged to pay him a bonus at all and had the discretion to reject his request in its entirety; (f) given the unique, extraordinary, and atypical bonus/adjustment Mr. Chism proposed, Mr. Chism took no steps to advise Ron or anyone else at Tri-State that he was acting in his own personal interest, which created a conflict; (g) and Mr. Chism did not seek Tri-State's informed consent to continued representation or advise Ron or anyone else to consult independent counsel regarding his proposed bonus.
45. Mr. Chism also breached his fiduciary duty to Tri-State, in violation of RPC 1.7, by advising Larry during the winter of 2011 and the spring of 2012 that the company owed Mr. Chism the $500,000 he had supposedly been promised by Ron and attempting to obtain Larry's independent written agreement that Tri-State would pay Mr. Chism that amount after: (a) Larry had specifically stated his belief that Mr. Chism took advantage of Ron's impairment in the manner in which Mr. Chism procured the supposed approval for this bonus; (b) Mr. Chism recognized that Larry's belief in that regard created a conflict in Mr. Chism's continued representation of Tri-State and working for Larry; (c) Mr. Chism's seeking of a new agreement with Larry to secure the $500,000 purportedly agreed to by Ron served only Mr. Chism's own personal financial interests and no interest of Tri-State; (d) Mr. Chism did not disclose to Larry that Ron had been under no obligation to pay Mr. Chism anything at the time Mr. Chism sought the bonus, and that the underlying premises for the bonus were inaccurate and unfair; (e) Mr. Chism took no steps to advise Larry that he was acting in Mr. Chism's own personal interest, not that of Tri-State, which created a conflict; and (f) Mr. Chism did not advise Larry or anyone else at Tri-State of Chism's personal interest or conflict, seek Tri-State's informed consent to continued representation in negotiating a new agreement, or advise Larry or anyone else at Tri-State to consult independent counsel.
Conclusions of Law 44-45.
Curiously, the trial court's RPC 1.7 conclusions focus exclusively on the FY 2011 bonus. This appears to be because Tri-State was experiencing financial difficulties at the time and, so

RPC 1.7 provides, in pertinent part:

> **(a)** . . . a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> . . .
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer.

By concluding that it was a conflict of interest for Chism to negotiate with Tri-State for the FY 2011 bonus, the trial court must have concluded that Chism represented Tri-State in its negotiations over his own wages. If this dubious conclusion were correct, it would cast doubt on the wage negotiations of scores of Washington attorneys—not only in-house corporate counsel like Chism, but also government attorneys and numerous non-profit attorneys. Yet, Tri-State is unable to cite any authority—from Washington or elsewhere—supporting its proposed interpretation.

Indeed, it is Chism who cites the only authority specific to this issue. Relative to the trial court's conclusion regarding the March 2012 request for payment of the FY 2011 bonus, Chism cites an advisory opinion from the Los Angeles County Bar Association (LACBA). Therein, the LACBA opined that a fee dispute did not, by itself, create a conflict of interest preventing continued

---

the theory goes, additional costs, in the form of increased wages for Chism, would have been particularly difficult for Tri-State to bear. The trial court's attempt to truss up its conclusions with so-called "bad facts" distorts the key issue—whether it is an inherent conflict of interest for a lawyer-employee to negotiate a wage increase from his or her current client-employer. If the answer is no, then the circumstances of the negotiation, including Tri-State's financial situation, are not a proper object of our scrutiny.

It is also notable that a number of the "bad facts" that the trial court used to buttress its conclusions were contrary to the jury's verdict. For example, the trial court casts doubt upon Chism's statement to Larry that Tri-State owed the FY 2011 bonus to him, yet the jury—acting in its constitutionally-prescribed role—found this to be true.

representation in litigation by a law firm whose client disputed its fee bill. LACBA Prof'l Responsibility & Ethics Comm., Op. 521 (2007).

In any case, the absence of authority supporting Tri-State's contention speaks volumes. The trial court's exercise of disciplinary authority based on a lawyer-employee negotiating a wage increase and then requesting payment of the increased wages was without precedent. Accordingly, even were we to decide that the trial court's conclusions were correct (a decision that we need not make), the resulting disgorgement order exceeded its authority.

In entering the challenged order, the superior court lost sight of its role and did not properly exercise the derivative power bestowed upon it by the Supreme Court. The Supreme Court has determined that, when it announces a novel application of a professional conduct rule, its pronouncement is to have only prospective effect. Haley, 156 Wn.2d at 343. Here, the superior court announced a—literally—unprecedented application of RPC 1.7 to in-house counsel. Yet, rather than treating the issue as one implicating attorney discipline and public (as opposed to private) rights, the superior court entertained the claim as if it were simply a tort claim subject to the traditional process of common law adjudication and judicial pronouncement of rights and duties—with its decision necessarily affecting the legal rights of the litigating parties. In doing so, it erred. Had it followed the mandate of the Supreme Court's Haley decision, the superior court would have recognized the novelty of its legal ruling, declined to impose a sanction, and dismissed the claim. This is what the Supreme Court did in Haley. It is what the superior court should have done here.

*RPC 1.8—Conflict of Interest: Current Clients: Specific Rules*

Tri-State alleged, and the trial court agreed, that Chism violated RPC 1.8 by negotiating with Ron for the September 2010 bonus arrangement and for negotiating with Larry for payment of the FY 2011 bonus and a mid-FY 2012 bonus.[25]

RPC 1.8 provides, in pertinent part:

> **(a)** A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully

---

[25] The trial court concluded, in pertinent part:

36. The Court concludes that Mr. Chism's proposed modified fee arrangement with Ron in September 2010 was not an "ordinary" fee agreement, because the proposal involved a significant change in the parameters of Mr. Chism's compensation, was made after the representation had already begun and after an existing fee agreement had already been in place for more than a year, and the new provisions benefitted only Mr. Chism. . . .

37. Mr. Chism's procurement of Ron's agreement to the new compensation arrangement in·September 2010 was a "business transaction" that was subject to the requirements of RPC 1.8(a).

38. Mr. Chism has not demonstrated he satisfied any of the requirements of RPC 1.8(a) in connection with his dealings with Ron regarding the new arrangement.

. . . .

50. Mr. Chism's negotiations with Larry and the resulting putative agreement were not ordinary fee discussions. Mr. Chism was not merely proposing payment under the parameters of the September 2010 arrangement, he was negotiating the payment of what Mr. Chism believed to be an outstanding debt to him for a $500,000 unpaid bonus for FY 2011, plus for the first time, payment of a *mid*-year bonus (in the amount of $250,000). Moreover, the particular transaction that Mr. Chism proposed, and later claimed Larry had agreed to, included a transfer of nonmonetary property of Tri-State—a Mercedes Benz owned by Tri-State worth at least $50,000, a computer, and a cell phone—as partial payment for Mr. Chism's services. These circumstances made Mr. Chism's negotiations with Larry in March 2012, and the putative "contract" that Mr. Chism argued and the jury concluded resulted therefrom, a business transaction within the scope of RPC 1.8(a).

. . . .

59. . . . Mr. Chism has not proven he satisfied any of the requirements of RPC 1.8(a). He failed to overcome the presumption of fraud as to the transaction with Larry in March 2012 and he violated his duty to Tri-State under RPC 1.8(a) by entering into it.

Conclusions of Law 37-38, 50, 59.

disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of an independent lawyer on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

"[The Rule] does not apply to ordinary fee arrangements between client and lawyer, which are governed by Rule 1.5." RPC 1.8 cmt. 1. However, "its requirements must be met when the lawyer accepts an interest in the client's business or other nonmonetary property as payment of all or part of a fee." RPC 1.8 cmt. 1. The rule likely also applies to fee agreement modifications after the attorney-client relationship is formed.[26]

In addition, the Rule does not apply to standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others, for example, banking or brokerage services, medical services, products manufactured or distributed by the client, and utilities' services. In such transactions, the lawyer has no advantage in dealing with the client, and the restrictions in paragraph (a) are unnecessary and impracticable.

RPC 1.8 cmt. 1.

---

[26] This is a sensible result. Kennedy, 74 Wn.2d 483, concerned mid-representation modifications to fee agreements, and the Kennedy requirements were incorporated into RPC 1.8(a)(1).

Indeed, Chism's own expert witness on attorney professional responsibility has opined that the concerns involved in midstream modifications of attorney fee agreements trigger the requirements of RPC 1.8(a).

[A]uthorities strongly suggest that the Washington Supreme Court, when faced with the issue, may well decide that a change to a fee agreement midstream benefiting the lawyer constitutes a business transaction with a client (and therefore a prohibited conflict of interest) unless the rigorous requirements of RPC 1.8(a) are met.

TOM ANDREWS ET AL., THE LAW OF LAWYERING IN WASHINGTON § 9, at 9-6 (Wash. State Bar Ass'n 2012) (chapter authored by Arthur Lachman, Chism's professional responsibility expert).

"'[A]n attorney-client transaction is prima facie fraudulent.'" Valley/50th Ave., 159 Wn.2d at 745 (quoting In re Disciplinary Proceedings Against Johnson, 118 Wn.2d 693, 704, 826 P.2d 186 (1992)). "The burden of proving compliance with RPC 1.8 rests with the lawyer." Valley/50th Ave., 159 Wn.2d at 745.

The trial court concluded that the September 2010 and March 2012 bonus agreements constituted fee arrangements but that neither was an "ordinary" fee arrangement and, thus, both were subject to the rule. The September 2010 agreement was not an ordinary fee arrangement, the trial court concluded, because it was a modification of an existing arrangement. The same was true of the March 2012 agreement, which the trial court also concluded was not an ordinary fee agreement because it involved some nonmonetary compensation.[27]

The trial court's conclusions regarding these agreements gloss over the essential differences between fee agreements and wage contracts. Under the trial court's interpretation of the rule, every compensation agreement entered into between a lawyer-employee and a current client-employer would be subject to RPC 1.8(a). This would include, for example, every agreement increasing a lawyer-employee's wages or benefits. This interpretation would also include every contract for a lawyer-employee's compensation that promised nonmonetary compensation, such as a company cell phone or computer and, perhaps, even health benefits.

By rendering their compensation agreements prima facie fraudulent, the trial court's interpretation would disturb the settled expectations of many lawyer-

---

[27] Per the March 2012 memo, upon his separation from the company, Chism was entitled to retain the company vehicle, computer, and cell phone. Finding of Fact 101.

employees. It would also subject standard wage contracts for lawyer-employees, which frequently include nonmonetary compensation, to greater scrutiny overall than standard fee contracts, which are generally exempt from the rule. Moreover, it would do this without addressing whether lawyer wage contracts should be exempt from the rule as another type of "transaction[ in which] the lawyer has no advantage in dealing with the client," RPC 1.8 cmt. 1, given that, in general, employees are thought to have relatively little power compared with that of their employers. Cf. Rickman v. Premera Blue Cross, 184 Wn.2d 300, 309, 358 P.3d 1153 (2015) (stating, regarding the wrongful termination cause of action, "allowing an exception to the at-will doctrine serves to equalize the imbalance of power that exists in an employment relationship").

More to the point for our purposes, the trial court's order appears, once again, to be without any specific precedent. In support of its application of RPC 1.8 to Chism in his role as general counsel, the trial court cited a New Jersey appellate court decision—Kaye v. Rosefielde, 75 A.3d 1168 (N.J. Super. Ct. App. Div. 2013), rev'd in part, 121 A.3d 862 (N.J. 2015). Therein, the court held that, at least in some circumstances, that state's equivalent to RPC 1.8 applies to in-house counsel. Rosefielde, 75 A.3d at 1203. It upheld a trial court's determination that Rosefielde, an in-house lawyer and corporate executive, had violated the RPC 1.8 equivalent by engaging in several business transactions that defrauded his employer (he was also found to have committed common law fraud). Rosefielde, 75 A.3d at 1203. However, the case did not concern Rosefielde's in-house counsel compensation. In fact, when Rosefielde

attempted to argue that RPC 1.8 should not apply to him as in-house counsel at all because it would then necessarily apply to employment offers, the trial court dismissed the argument as a "straw man" that was not at issue and, therefore, would lead to irrelevancies. Rosefielde, 75 A.3d at 1203 n.30.

For his part, Chism cites WSBA advisory opinion 1045 in support of his interpretation and actions. Therein, the WSBA opined that it was not a violation of RPC 1.8 for a lawyer to negotiate an employment contract to move in-house with a current client.[28] This opinion, if correct, indicates that it also would not violate RPC 1.8 for an attorney to negotiate a supplemental employment contract—for example, an agreement to add a bonus structure—with a current client.[29]

Both parties also presented expert testimony at trial regarding the professional duties owed by a lawyer-employee to a client-employer related to negotiation of the lawyer-employee's compensation. The trial court first heard from Tri-State's expert, David Boerner, who previously taught professional responsibility courses at Seattle University School of Law as well as numerous

---

[28] The full opinion states:
A lawyer negotiated with corporate management over an employment contract to serve as legal counsel. The contract provided that part of the lawyer's compensation would be shares in the publicly traded corporation. The Committee was of the opinion that negotiations as described by you in working out an employment contract for the full time job of legal counsel for a corporation does not violate RPC 1.8. It appeared to be an arm's length transaction, and it did not appear that you were in any way giving legal advice to the corporation.
WSBA Rules of Prof'l Conduct Comm., Advisory Op. 1045 (1986).
Because RPC 1.8 only applies to current clients, it must be the case that the potential employer in question was also a current client of the attorney. See Rafel Law Grp. PLLC v. Defoor, 176 Wn. App. 210, 220, 308 P.3d 767 (2013).
[29] Interestingly, the opinion does not even mention the general prohibition against conflicts in RPC 1.7. By skipping that rule and focusing, instead, on the specific prohibitions in RPC 1.8, the opinion implies that RPC 1.7 is not implicated by the employment contract in question. This also supports Chism's contention regarding the inapplicability of RPC 1.7 to his situation.

continuing legal education (CLE) seminars on the same subject. Boerner conducted some research into the question herein presented,[30] but he was already aware from his experience in this area that there was no authority directly on point. Nevertheless, based on his interpretation of the limited related authority available, Boerner opined that a lawyer-employee is generally bound by a fiduciary duty and the requirements of RPCs 1.7 and 1.8 when negotiating with his or her client-employer for compensation.

The trial court heard next from Chism's expert, Arthur Lachman. Lachman is a current practitioner in the area of attorney professional responsibility. He previously taught professional responsibility courses at the University of Washington School of Law, as well as CLE seminars on the same subject, and is one of the authors of the treatise entitled "The Law of Lawyering in Washington." See, supra note 26. In preparation for offering an opinion in this case, Lachman consulted various written resources, including treatises, cases, and bar opinions from across the country, and contacted other experts in the field of attorney professional responsibility. Having done so, Lachman concluded, like Boerner, that there was no direct authority on the question presented. Nevertheless, based on the related resources available, Lachman opined that a lawyer-employee is not generally bound by a fiduciary duty or the requirements of RPCs

---

[30] Boerner conducted markedly less research on the relevant topic than Chism's expert. Aside from studying the particular circumstances of this case, he relied heavily on his preexisting knowledge.

1.7 and 1.8 when negotiating his or her own compensation with the client-employer.[31]

The stark contrast between Boerner's and Lachman's expert opinions illustrates the lack of clarity regarding the professional obligations of a lawyer in Chism's position. At the time that he engaged in the conduct now at issue, Chism could not have anticipated the ethical and disciplinary consequences of his actions. And he could have achieved no certainty with regard to those consequences even if he had recognized the ethical question now presented and retained two top experts in the field of professional responsibility to get their opinions.

Thus, in this instance, like the last, the application of the rule to these circumstances was unclear at the time that Chism acted and, therefore, even were we to decide that the trial court's interpretation was correct (a decision that we need not make), Chism's conduct could not have served as the basis for penalizing the alleged professional misconduct. In such circumstances, only prospective application of the newly interpreted RPC is warranted. Haley, 156 Wn.2d at 343. The superior court should have declined to impose discipline and dismissed the claim.

*RPC 8.4—Misconduct*

Tri-State alleged, and the trial court agreed, that Chism violated RPC 8.4(c) numerous times related to the bonus arrangement. Specifically, the trial court concluded that he violated the rule: (1) by stating that his original in-house

---

[31] He concluded that this was so because issues related to a lawyer-employee's own compensation are not generally considered to be within the scope of that lawyer's representation of his client-employer.

- 37 -

salary was based on him working an average of approximately 1.5 hours per day, or 380 hours per year, (2) when he stated in the September 2010 memo that his current compensation was "set over ten years ago," though it was at most eight years, (3) when he provided an estimate of his FY 2010 hours in September 2010, (4) when he stated in the November 2011 memo that the bonus arrangement had been in effect for "the last couple of years," though it had been just over a year, (5) when he gave the November 2011 estimate of his FY 2011 hours, (6) when he stated in the November 2011 memo that Ron had agreed that Chism would be paid the bonus, without stating that it was conditional on settlement of the legal claim, and (7) by advising Larry that Tri-State was "obligated" to pay Chism a bonus for the first half of FY 2012.[32]

---

[32] The trial court concluded, in pertinent part:

61. Mr. Chism violated his duty of honesty and forthrightness to Tri-State under RPC 8.4(c) and Washington common law by misrepresenting to Ron in September 2010 that his then-current compensation was "based on me spending an average of less than an hour and a half a day on Tri-State matters, or about seven hours a week," when Mr. Chism knew at the time he made this statement that his existing salary and the retainers that preceded it were always meant to compensate him for all of the non-litigation hours that he worked for Tri-State and that he had raised his retainer several times to reflect that the amount of work had increased over time.

62. Mr. Chism violated his duty to Tri-State under RPC 8.4(c) and Washington common law by misrepresenting to Ron, in that same communication, that his "current compensation" was "set over ten years ago," when Mr. Chism knew at the time he made this statement that his true "current" compensation—i.e., his $190,000 salary—had just been set a year-and-a-half previously. The same is true even if Mr. Chism meant the memo to reference the GC retainer, which had been initiated in 2002. Not only was that compensation initiated eight years ago, rather than ten, his compensation of $500 an hour had only been set during the preceding six months or so before he went in-house.

63. Mr. Chism violated his duty to Tri-State under RPC 8.4(c) and Washington common law by stating to Ron in September 2010 that during the prior fiscal year, "realistically I have probably been averaging something over 60% of a normal workday on your matters. To be conservative, let's call it 50%. That translates into 1,000 hours of time, of which 380 hours have been covered by my base compensation." Mr. Chism knew at the time he made this statement that he had kept no records of the time he spent on Tri-State work and had no other reliable basis to say how many hours he had worked during the prior fiscal year, and yet he misrepresented these figures to Ron as reasonable estimates. Mr.

To begin, some of the trial court's RPC 8.4 conclusions are clearly improper. In particular, there is no authority for the trial court's conclusion that Chism violated the rule twice by providing Tri-State "unreliable" estimates of the number of hours that he had worked during specific periods of time (supra (3) and (5)). In reaching its conclusions, the trial court relied on cases prohibiting lawyers from seeking payment based on reconstructed billing records. See Conclusion of Law 60 (citing, inter alia, In re Disciplinary Proceedings Against Dann, 136 Wn.2d 67, 960 P.2d 416 (1998)). Those cases do not apply to the circumstances herein. Chism did not create an impression of precision by presenting Tri-State a detailed invoice, nor did he expressly demand payment of

---

Chism also knew at the time he made this statement that there had been no agreement that his salary covered only 380 hours a year; rather, he had agreed to do "whatever it takes" in exchange for his salary just as he had agreed to do whatever it takes in exchange for his GC retainer.

64. Mr. Chism violated his duty to Tri-State under RPC 8.4(c) and Washington common law by misrepresenting to Ron in November 2011 that Mr. Chism's bonus arrangement had been in effect "[f]or the last couple of years," when Chism knew at the time he made this statement that he had only received one prior bonus and that the arrangement had been in effect for just barely over one year.

65. Mr. Chism violated his duty to Tri-State under RPC 8.4(c) and Washington common law by stating to Ron in November 2011 that during the prior fiscal year, Mr. Chism had "actually been working full time, plus, on your matters . . . conservatively call it 70%, or 1,400 hours," when Mr. Chism knew at the time he made this statement that he had kept no records of the time he spent on Tri-State work and had no other reliable basis to say how many hours he had worked during the prior fiscal year, and yet he misrepresented these figures to Ron as reasonable estimates.

66. Mr. Chism violated his duty to Tri-State under RPC 8.4(c) and Washington common law by misrepresenting to Ron in November 2011 that they had agreed Mr. Chism would get paid a $500,000 bonus the following year, whether out of the DEA claim or some other matter, when Mr. Chism knew at the time he made this statement that Ron had told him Tri-State could and would not pay Mr. Chism any bonus until the money from the DEA claim, in particular, came in.

67. Mr. Chism violated his duty to Tri-State under RPC 8.4(c) and Washington common law by advising Larry in March 2012 that Tri-State was obligated to pay Mr. Chism a bonus for work performed during the first half of FY 2012, when Mr. Chism knew at the time he made this statement, by reason of the very terms of the memo he had presented to Ron in September 2010, that whether or not any bonus was ever to be paid to Mr. Chism was purely discretionary on Tri-State's part, and that no obligation to pay a bonus existed.

Conclusions of Law 61-67.

any specific amount. Rather, per the parties' agreement, he gave Tri-State his "best estimate" of the hours that he had worked during certain periods and left it to Ron or Larry's discretion to determine the amount of any corresponding bonus. There was no misrepresentation in violation of RPC 8.4.

The trial court's determination that Chism also violated the rule by misrepresenting the mid-year FY 2012 bonus as Tri-State's obligation, rather than within its discretion, supra (7), is also flawed. The trial court's description of the relevant interaction in its conclusion is inconsistent with the court's descriptions of the same interaction in its findings and, thus, the conclusion is unsupported. Compare Conclusion of Law 67 with Findings of Fact 97, 101.

Aside from the question of the propriety of the trial court's remaining RPC 8.4 conclusions,[33] the court's disgorgement order presents a significant legal hurdle. In particular, it raises the question of whether a trial court is empowered to disgorge an attorney's *wages*, as opposed to an attorney's *fees*.

The trial court's order disgorging Chism's wages appears to be without precedent. While the parties cite numerous cases involving fee disgorgement, see, e.g., Eriks, 118 Wn.2d 451, they cite no case authorizing the disgorgement of an attorney's wages. Neither do they cite any other authority, such as a bar opinion, in support of this proposition. Indeed, counsel for Tri-State confirmed at

---

[33] An assumption of propriety would be dubious in this case. The parties do not cite any examples of attorneys being disciplined under RPC 8.4 for misconduct comparable in magnitude to some of Chism's alleged misconduct.

oral argument in this court that, to his knowledge, no such authority exists—in Washington or elsewhere.[34]

The lack of authority supporting the trial court's disgorgement order is not mere coincidence but, rather, reflects important differences in the treatment of attorney fees versus wages. For example, whereas our Supreme Court has actively regulated attorney fees, see, e.g., RPC 1.5, it has not at all regulated attorney wages. By contrast, the legislature has engaged in active regulation in the wage and hour context. The legislature has passed extensive legislation with the purpose of protecting employee wages, including laws regarding the minimum wage, overtime, and wage withholding. See Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 159, 961 P.2d 371 (1998) ("'[T]he fundamental purpose of the [pertinent wage] legislation . . . is to protect the *wages* of an employee against any diminution or deduction therefrom.'" (first alteration in original) (quoting State v. Carter, 18 Wn.2d 590, 621, 140 P.2d 298, 142 P.2d 403 (1943))); Jumamil v. Lakeside Casino, LLC, 179 Wn. App. 665, 682, 319 P.3d 868 (2014) ("The wage statutes were enacted to prevent abuses by employers in the labor-management setting, and they reflect the legislature's strong policy in favor of payment of wages to employees."). Indeed, lawyer-employees are protected by the same wage and hour laws that apply to employees in comparable positions. See, e.g., Corey v. Pierce County, 154 Wn. App. 752, 225 P.3d 367 (2010) (deputy prosecuting attorney who prevailed on a wrongful termination claim entitled to an award of attorney fees based on

---

[34] Wash. Court of Appeals oral argument, Chism v. Tri-State Constr., Inc., No. 72844-0-I (Feb. 24, 2016), at 18 min., 30 sec. (on file with court).

recovery of a judgment for *wages* owed). Our Supreme Court has never questioned the propriety of the legislature's occupation of this regulatory field.

The question presented arises at the intersection of judicial power over the practice of law and legislative power over the conditions of employment. Our Supreme Court has offered some guidance about resolving such situations, stating, "While we should jealously protect our prerogatives, if the legislative power is not limited by the constitution, it should be unrestrained." Demopolis, 103 Wn.2d at 65. As previously stated, in the area of attorney wages, the Supreme Court has taken no action, but the legislature has enacted a broad policy in favor of the payment of employee wages. Given this stark contrast, we defer to the strong legislative policy in this area.

This conclusion is consequential for how we view the application of the disgorgement sanction to attorney wages. As has been described, disgorgement does not require proof of either causation or damage, only misconduct. This is unlike other, related claims, including breach of fiduciary duty and restitution, both of which require such proof. Because there is no standard measure for a disgorgement order, nor a requirement that it be imposed as a compensatory measure, it poses a significant threat to the legislative policy in favor of the consistent payment of employee wages.

This threat is illustrated by the trial court's order in this case. Herein, Tri-State chose to pursue only disgorgement from Chism, not a separate claim for

damages or restitution.[35] Accordingly, Tri-State was never required to prove that it suffered any injury as a result of Chism's alleged misconduct. Nevertheless, the trial court ordered Chism to disgorge $550,000 in wages (plus another $550,000 in exemplary damages for wage withholding).

The trial court exceeded its disciplinary authority by ordering Chism to disgorge a significant portion of the wages otherwise owed to him without either acknowledging that it was disgorging wages, not fees, or accounting for the strong legislative preference in favor of employers paying earned employee wages. Therefore, the trial court's order was improper as a matter of law.

IV

Based on our resolution of the preceding issues, we need not reach the additional issues raised by the parties.[36]

Chism is also entitled to an award of reasonable attorney fees on appeal pursuant to RCW 49.48.030 and RCW 49.52.070. Upon compliance with RAP 18.1, a commissioner of this court will enter an appropriate order.

---

[35] Presumably, this was a strategic choice stemming from the difficulty of proving damage from a lawyer's misconduct when the lawyer in question was found by the trial court to have saved the company through his efforts.

[36] There is no basis for Tri-State's counterclaims, which all presuppose the validity of the trial court's disgorgement order. In particular, we reject its challenge to the trial court order awarding Chism reasonable attorney fees.

Reversed and remanded to the trial court for entry of judgment upon the jury's verdict.[37]

_Dwyer, J._

We concur:

_Cox, J._                    _Becker, J._

---

[37] Statutory damages must also be calculated based on the jury's verdict.